EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* DIMAS PÉREZ SOTO, acusado y apelante.

Número 15859.

*Sometido:* 1 de marzo de 1955. *Resuelto.:* 26 de junio de 1956.

*Santos P. Amadeo, José E. Cabrera Rivera* y *Manuel A. Barreto Barrios,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Rafael L. Ydrach Yordán, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Belaval emitió la opinión del Tribunal.

La prueba de la acusación en este caso presenta dos versiones irreconciliables sobre la manera en que ocurrió el accidente. El testigo señor Carmelo Rodríguez Valle, quien conducía un camión, en dirección de Arecibo a San Juan, declara, que a su izquierda, delante de él y en la misma dirección que el testigo conducía el camión, caminaba un adolescente, por el "despaseo" como dos tres pies fuera de la carretera; que de San Juan para Arecibo, venía un Ford conducido por el acusado; que al cruzarse ambos vehículos sintió un cantazo y paró su camión un poco más adelante; que cuando miró, ya el carro le había pasado por encima al muchacho; que cuando descendió del camión vió que el adolescente estaba muerto en la carretera; que "el carro podría ir a más de sesenta millas"; que cuando recibió el golpe "el muchachito estaba fuera de la carretera, como a tres pies de la carretera"; que él vió el accidente por el espejo, cuando oyó la enfrenada del automóvil del acusado, (T. de E. 9–19).

El testigo señor Augusto Molina, un policía insular que llegó más tarde al sitio del accidente, declara, que el acusado,

en el mismo sitio del accidente, le dijo que no venía a gran velocidad, que el adolescente estaba parado en la grama del paseo; que al pasar cerca de donde estaba el adolescente, el mismo trató de espantar un caballo, que el caballo "había hecho ademán que iba a relinchar y cuando el muchacho trató de correr para defenderse fué que lo estropeó con la parte derecha delantera del carro"; "que había sido una cosa rápida, que el muchacho estaba en la orilla en el momento que él pasaba y que todo ocurrió instantáneamente", (T. de E. 30–31).

El tercer y último testigo de la prueba de la acusación, el Honorable Joaquín Correa Suárez, Juez Superior de Puerto Rico, declara, que al terminar sus labores judiciales, se dirigía a San Juan y se encontró con que había ocurrido un accidente, y vió "un muchachito que estaba atravesado en la carretera", un camión que iba en la misma dirección suya (de Arecibo a San Juan) bastante delante de él y un automóvil que venía de Manatí para Arecibo; que el camión empezó a reducir con ánimo de detenerse y él le hizo seña para que se detuviera; que el chófer que conducía el otro vehículo, se paró como a veinte o veinticinco pies de donde estaba el cadáver del muchachito, se bajó y con una exclamación de asombro dijo "Dios mío, que ha sido esto"; que el chófer admitió que le había dado con el carro al muchachito; que "el muchachito estaba atravesado en forma perpendicular de la línea del centro de la carretera, hacia la izquierda mía, yendo yo de Arecibo para San Juan"; que él se puso a medir con los pies, con los zapatos, la distancia en que se encontraron las primeras partículas de cristal de algo; que después notó que las partículas eran del "cristal derecho del carro que guiaba el acusado"; que midieron también "el sitio entre unos papeles y unos centavos—parece que el muchachito llevaba ese dinero—y había como alrededor de sesenta a setenta pies de distancia, medidos por los zapatos míos"; que del sitio dónde estaba el muchachito a donde paró el carro del acusado había de veinte a veintidós

pies aproximadamente; que se encontraban partículas de cristal como por sesenta pies, (¿pasos?) y después veinte pies de donde estaba el niño a donde paró el carro, ochenta pies desde la primera colisión a donde paró el carro; que le preguntó al chófer del camión cómo había sido el accidente, si él había visto algo y el chófer le dijo "que no había visto como había sido el accidente"; que el testigo vió un caballo que había cerca del sitio donde ocurrieron los hechos, "comiendo en ese momento pasto de la cuneta, donde dijo el chauffer que iba caminando el muchachito; que la distancia desde donde estaban los primeros cristales a donde estaba el niño tendido, era aproximadamente como ocho a diez pies más del largo de aquí (silla de los testigos) a la otra pared (¿fondo del salón de audiencia?); que la distancia desde donde estaba el cadáver del niño a donde paró el automóvil del acusado sería "como de aquí (silla de los testigos) a donde está el señor acusado"; (¿final del estrado?); que "aparentemente el impacto fué que el muchachito estaba atravesando la militar"; que las partículas de cristales, estaban dentro de la brea, "la mayor parte podrían estar a pie y medio o dos pies y medio de distancia del despaseo, de la línea exterior de la carretera", (T. de E. 21–28).

No hay duda que la versión del accidente, según la presenta el testigo señor Carmelo Rodríguez Valle, es confusa e improbable. Además de las palabras pronunciadas por el ilustrado Juez sentenciador se desprende, al revés de lo que alega el apelante, que él no le dió crédito a la declaración de este testigo. Al momento de dictar sentencia, el ilustrado Juez sentenciador se expresó en los siguientes términos: "la corte entiende que en este caso, del conjunto de la prueba, se ha demostrado que ha habido negligencia crasa por parte del acusado, negligencia criminal. Si bien es cierto que había un caballo, como ha demostrado la prueba, también él sabía que el niño estaba en el paseo y ese hecho es suficiente de por sí, para que el acusado, tan pronto lo vió, empezara a tomar precauciones para reducir la velo-

cidad. El carro, *no hay duda que se estaba conduciendo a velocidad exagerada* toda vez que desde el sitio en que estaban los primeros pedazos de cristal hasta donde paró había unos sesenta pies. Sesenta pies desde el cadáver y veinte pies después. Si ese carro viene poco a poco pudo evitar el accidente y pudo haber parado cerca. El hecho de *parar tan lejos es señal clara de que venía a velocidad exagerada.* El niño, según dijo el testigo, al tirarlo al centro de la carretera como a dos pies del encintado *es señal que le dió fuerte porque venía a velocidad exagerada.* La prueba la corte entiende que es suficiente y le declara culpable de homicidio involuntario", (T. de E. 32–33).

Por lo tanto, a los efectos de resolver este caso, tomaremos como cierta la versión del acusado, corroborada por el Juez Joaquín Correa Suárez, en el examen inmediato que realizó del sitio del accidente: que ese día, el acusado conducía un automóvil en dirección de San Juan a Arecibo; que en dirección contraria de Arecibo a San Juan, caminaba por el "despaseo", fuera de la carretera, un adolescente de 14 años; que en la cuneta de dicho despaseo había un caballo; que al pasar junto al caballo, el caballo relinchó, el adolescente se asustó y trató de cruzar hacia la **carretera,** en el momento en que el acusado pasaba por su derecha junto al adolescente; que el automóvil del acusado le dió con el farol delantero derecho al adolescente, quien quedó tendido en mitad de la carretera, como a sesenta pasos del sitio en que el automóvil le dió al adolescente.

El ilustrado Juez sentenciador basó su conclusión de culpabilidad en el hecho que el acusado corría a velocidad exagerada, y dedujo la velocidad exagerada del hecho probado que el cuerpo del adolescente cayó tendido a sesenta pies del sitio donde el automóvil le dió al adolescente. La prueba no tiene indicios de si el automóvil arrastró o "enganchó" al adolescente antes de pasarle por encima, aunque tanto la prueba oral como el examen autópsico, tienden a indicar que el automóvil le pasó por encima al adolescente,

en algún momento por alguna parte del cuerpo comprendida entre los hemitórax, el abdomen y los muslos.

Para determinar la negligencia criminal, en cuanto al extremo de la velocidad, la ley aplicable al caso es el art. 15 (a) de la Ley de Automóviles y Tránsito de 1946 según quedó enmendado por la Ley núm. 156 de 26 de abril 1951, —9 L.P.R.A. 606, sec. 185—que dispone: "la velocidad de un vehículo de motor deberá regularse con el debido cuidado, teniendo en cuenta el ancho, tránsito, uso y condiciones del camino. Nadie deberá guiar a una velocidad mayor de la que le permita ejercer el debido dominio del vehículo y reducir la velocidad o parar cuando sea necesario para evitar atropellar a una persona o chocar con algún vehículo u otro artefacto de transporte que esté en la carretera o entre en la misma ajustándose a los requisitos legales y al deber en que están los conductores y otras personas que usan las carreteras de tener el debido cuidado" y el art. 17 (o) de la misma Ley de Automóviles y Tránsito de 1946—9 L.P.R.A. 613, sec. 187—, que dispone: "el Secretario [de Obras Públicas] queda por la presente autorizado para dictar reglas adicionales para regular el tránsito en los caminos públicos . . . estas reglas, una vez promulgadas, tendrán fuerza de Ley." Es de notarse, que con la enmienda que sufre el art. 15 en 1951, se elimina la disposición anterior que disponía: "constituirá evidencia prima facie de que un vehículo es conducido a una velocidad irrazonable y en contra de lo dispuesto en la letra (a) anterior, si el mismo fuere conducido . . . a una velocidad mayor de cuarenta y cinco (45) millas por hora en los demás casos", (referentes a las zonas rurales o caminos públicos). No se nos ha señalado por las partes, ni nosotros hemos podido encontrar ningún reglamento del Secretario de Obras Públicas para regular el tránsito en los caminos públicos, que después de promulgado, tenga fuerza de ley. Por tanto, tenemos que concluir que para regular el tránsito en los caminos públicos de Puerto Rico, la única disposición que existe desde el 1951, aplicable

a este caso, es la disposición genérica del art. 15 (*a*) que antes hemos acotado.

 Cuando se examina el estado de la ley prevaleciente al momento del accidente, resulta claro que el límite de velocidad a que debe conducirse un vehículo está determinado por los siguientes factores (1) el ancho del camino; (2) el tránsito de vehículos; (3) el uso a que se destina el camino o carretera públicos; (4) las condiciones del camino o carretera. En cuanto al "debido cuidado" que le impone al chófer el poder tuitivo del Estado, con relación a la velocidad a que debe conducir un vehículo, resulta claro que la indagación judicial debe cubrir los siguientes aspectos: (1) si el posible infractor tenía el debido dominio del vehículo que conducía y (2) si reduciendo la velocidad o parando el vehículo el posible infractor hubiera podido evitar atropellar a alguna persona o chocar con algún vehículo u otro artefacto *dentro de la carretera* o que estuviera entrando en la misma.

La prueba en este caso demostró que se trataba de una carretera "recta y ancha", (T. de E. 12); que fuera del camión que caminaba de Arecibo a San Juan y el automóvil, conducido por el acusado, que caminaba de San Juan a Arecibo, no había más vehículos transitando por la carretera cuando ocurre el accidente, (T. de E. 12 y 19); que se trataba de una vía pública, conocida como "carretera militar", (T. de E. 12); que se trataba de una carretera que tenía un espacio para que por él transitaran los peatones, un "despaseo", fuera del borde de la carretera y de la brea, (T. de E. 10, 15, 26, 27); que la carretera "estaba seca" (T. de E. 13); que el accidente ocurrió a las seis menos cuarto de la tarde, cuando "estaba el sol alto todavía", (T. de E. 16).

Dentro del cuadro que presentan estos hechos es difícil determinar, hasta qué extremo, resulta negligencia criminal *per se*, la velocidad a que conducía su automóvil el acusado en este caso sobre todo, cuando no hay ningún máximo de

velocidad, prescrito por ley o por reglamentación que tenga fuerza de ley. Como cuestión de realidad, el acusado se cruzó con un camión que venía en dirección contraria, sin ningún percance.

En cuanto a si el acusado tenía el debido dominio del vehículo que conducía y podía reducir la velocidad o parar el vehículo a los fines de evitar el atropello a alguna persona, no hay indicios en la prueba, que el acusado condujera el vehículo en forma atolondrada, o en alguna otra forma, de la cual se pudiera inferir descuido o imprudencia. Como cuestión de hecho, frente a él, *dentro de la carretera* no hay ninguna otra persona, vehículo o artefacto de transporte, con excepción del camión que cruzó sin ningún tropiezo, que lo indujera a reducir la velocidad o a parar el vehículo para evitar atropellar a alguna persona. Tampoco se trataba de ninguna zona fronteriza a un cruce, o una zona escolar. El adolescente que transitaba por el despaseo, *fuera de la carretera*, venía caminando de frente al vehículo que conducía el acusado. El chófer del camión declaró que en el momento en que oyó el golpe, cuando el adolescente chocó con el farol derecho delantero del automóvil que conducía el acusado, también escuchó los frenos que puso el acusado, "una frenada suave".

Tal como se produjo este accidente, no creemos que la reducción de velocidad, que indudablemente intentó el acusado en el momento mismo de la colisión, hubiera podido evitar el desgraciado suceso. La simultaneidad con que se produce en el momento de la colisión el paso del automóvil con el cruce hacia la carretera del adolescente, hacía del todo imposible detener el vehículo para evitar la muerte del último.

■ La otra única prueba de incriminación es el trayecto que camina el automóvil, desde donde choca con el adolescente. El Juez Correa Suárez siguiendo el rastro de las partículas de vidrio del farol roto, declara que había sesenta pies desde el sitio donde ocurre la colisión hasta donde estaba el cuerpo tendido del adolescente. Convenimos

que en accidentes urbanos, en accidentes cerca de una escuela pública, en accidentes cerca de un cruce de carreteras, y aún en accidentes en zonas rurales, si en el momento de la colisión se demostrara el tránsito dentro de la carretera, de cierto numerario humano o la presencia dentro de la carretera, de ciertos objetos mecánicos, el hecho de que el automóvil se detuviera sesenta pies más allá de donde se produce la colisión, merecería una consideración mucho más severa. Véase, por ejemplo, *Pueblo* v. *Negrón (Per Curiam)*, ante pág. 296, (1956); *Pueblo* v. *Piñeiro*, 77 D.P.R. 531, (Sifre), (1954); *Pueblo* v. *Andino*, 78 D.P.R. 782 (Marrero), (1955); *Pueblo* v. *López*, 77 D.P.R. 607 (Sifre), (1954).

Pero las circunstancias de este caso, nos obligan a distinguirlo de nuestras otras decisiones que guardan alguna relación con los accidentes de circunvalación, debidos a exceso de velocidad. La forma como el adolescente penetra en la carretera en el momento en que el autómóvil del acusado pasa a su lado, nos convence que se trata de un accidente inevitable y no de un caso de negligencia criminal.

*Debe revocarse la sentencia apelada y absolverse libremente al acusado.*