EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CARLOS NOEL ORTIZ MORALES, acusado y apelante.

*Número:* 16893    *Resuelto:* 14 de noviembre de 1962

*Santiago Polanco Abréu* y *Luis H. Rivera Torres,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Héctor R. Orlandi Gómez, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El apelante fue convicto de homicidio involuntario bajo una acusación que le imputó que en ocasión en que manejaba un vehículo de motor, lo hizo con tanta negligencia, descuido y falta de la debida circunspección, a exceso de velocidad, sin tomar en cuenta las condiciones y ancho de la carretera, que arrolló con dicho vehículo a Luis Tomás Arce. El accidente ocurrió como a la 1:30 de la tarde del 29 de octubre de 1959 y Arce falleció alrededor de tres horas después. Una moción de nuevo juicio a base de prueba nuevamente descubierta fue declarada sin lugar. Señala en apelación como errores cometidos por la Sala sentenciadora: (1) la negativa a conceder un nuevo juicio; (2) el declararlo convicto sin que hubiera

prueba suficiente; y (3) error al definir el delito de homicidio involuntario en las instrucciones al jurado.

Consideraremos de inmediato el segundo error señalado. El Pueblo no expuso teoría. Su primer testigo fue el médico que practicó la autopsia. La víctima presentaba erosiones o arañazos en la parte frontal derecha de la cabeza y en la región del oído derecho, también pequeñas erosiones en el codo derecho y en la parte dorsal de esa mano. En el abdomen tenía otra erosión con hematoma en la región inguinal derecha de unas tres pulgadas de ancho por dos de largo. En la espalda había una pequeña herida incisa transversal aproximadamente de una pulgada en la parte media de la cintura. El hombro izquierdo presentaba una erosión grande y heridas en la mano y en el antebrazo izquierdos. La cavidad torácica no presentaba lesiones. En la región posterior tenía la rotura del riñón izquierdo con gran hemorragia alrededor de la vejiga. Tenía un hematoma en la región de los huesos coxiales en el lado izquierdo y fractura del hueso ilíaco en su unión con el fémur con hemorragia grande en esa zona. La cavidad craneal no presentaba fractura de huesos, sí una hemorragia meníngea general en la masa encefálica. La causa de la muerte fue la lesión del cerebro causada por el trauma cerebral. Manifestó el médico que para romper un riñón tiene que ser un golpe violentísimo; normalmente un golpe suave no rompe un riñón así.

El segundo testigo del Pueblo fue Cándida Soltrén. Dijo que venía de trabajar y se paró en la orilla de la carretera al lado de la casa de Hermenegildo Román; que la víctima caminaba por su derecha por la orilla de la carretera, no sabe si venía o no pisando la brea y en la misma dirección corría el vehículo que causó el accidente; venían dos personas, un hombre y una mujer que se bajaron a llevar a la víctima al carro. No oyó que el automóvil tocara "claxon"; el vehículo venía corriendo "duro" a velocidad; que le parece que el carro le dio a la víctima "por este lado" señalando, según el récord, la cintura por el costado del lado izquierdo; que cuando llegó,

Hermenegildo Román estaba allí y ella ayudó a acomodarle los pies a la víctima en el carro del acusado y cuando el vehículo iba a salir los guardias se enfrentaron con él. Cuando el vehículo le dio a la víctima el acusado siguió un poco y dio para atrás, el automóvil paró "como a 15 ó 10 pies" una cosa así del sitio donde hubo el impacto. El acusado no dijo nada, estaba verde y pálido. Manifestó esta testigo que la carretera allí es ancha y está dividida en dos por una "cinta" blanca. No se fijó si habían signos sobre la velocidad. No estaba lloviendo, era un día claro de sol, las condiciones de la carretera eran buenas; no había ningún otro automóvil allí, ni ningún obstáculo ni personas ni nada. En el contrainterrogatorio manifestó que vivía en aquel barrio hacía once años; que el muchacho (la víctima) y sus familiares vivían por la parte de atrás de su casa; le vio criar y nacer y eran vecinos; que estaba como a 30 ó 35 pies del sitio del accidente; que sintió el cantazo y el carro le dio y lo tiró para el pasto y siguió, paró de diez a quince pies y viró para atrás a cogerlo. Ella se quedó mirando así y fue para allá donde lo estaban echando al automóvil y ayudó a echarle los pies. En ese momento no pasaban vehículos por allí. En aquel canto no había nadie. Cuando llegó allí, estaba Hermenegildo Román echándolo en el carro; que al acercarse ya Hermenegildo y el acusado habían echado a la víctima dentro del carro y ella dijo "ay, si es Luis Tomás", y ayudó a entrarle los pies. Estaba allí cuando llegó la policía pero no se quedó a informar lo que había visto. Fue a decírselo a la familia. Ese mismo día del accidente declaró por la noche en la Fiscalía.

Después del testimonio de Cándida Soltrén El Pueblo presentó el de Hermenegildo Román. Declaró que al ocurrir el accidente él estaba sentado en una hamaca en la sala de su casa, descalzo y en camisilla. Sintió un carro que venía como de Isabela hacia Aguadilla; sintió el impacto que dio duro en una cosa. Al sentir el impacto salió corriendo a ver y ya habían bajado del carro un hombre y una mujer; se fijó que había un hombre tirado en el pasto fuera de la carretera y

el señor (refiriéndose al acusado) le gritó que avanzara para que le ayudara a echar al hombre en el carro. Ayudó a colocar a la víctima en el asiento y cuando ya había salido el carro con la víctima para el hospital llegó la policía. En aquel sitio no se encontraba nadie y él fue el primero que llegó. El cuerpo de la víctima estaba en la orilla de la carretera en el pasto a un promedio de 25 pies del automóvil. La casa del testigo queda a unos 30 ó 40 metros de la orilla de la carretera hacia adentro. El carro parado estaba a un promedio de 50, 60 ó 70 pies de la casa. Cuando oyó el impacto voló hacia el sitio corriendo, no se puso nada, se fue en camisilla y sin zapatos. Cuando llegó la policía ya el carro se había ido con la víctima y entonces siguió acumulándose gente. Al preguntársele si recordaba si el automóvil había tocado "claxon" dijo no haber sentido nada; que oyó la enfrenada y el impacto cuando dio; que fue un golpe tremendo, demasiado grande. En el contrainterrogatorio el testigo negó de manera enfática que la señora Soltrén hubiese presenciado el accidente.[1]

El tercer y último testigo del Pueblo fue el policía Otilio Serrano. Hacía la patrulla de tránsito acompañado de otro policía. De Aguadilla hacia Isabela pudo notar que en dirección opuesta estaba estacionado un carro pequeño recogiendo a un señor herido. Se detuvieron y el acusado les explicó lo que ocurría y dejaron que continuara hacia el hospital.

[1] Sobre este particular el récord demuestra: "P.—Le voy a hacer una pregunta que quiero que me la conteste específicamente.... P.—Doña Cándida Soltrén es una señora...—R.—Una vecina mía de aquel mismo barrio, y el muchacho era vecino mío también. P.—Tenga la bondad de decirle a la Dama y Caballeros del Jurado si esa señora estaba allí cuando ocurrieron los hechos. R.—Esa señora no estaba allí. . . P.—. . . Ahora, yo le pregunto si usted vio por allí a doña Cándida Soltrén. R.—Allí no estaba ella; allí no había nadie; estaba el chófer y la doña que venían en el carro. P.—Qué personas ayudaron a echar al herido al automóvil? R.—Bueno, yo ayudé al chófer a echarlo, y al cabo del ratito llegó ella; entonces estaba allí ella pero cuando el impacto ella no estaba allí; allí no había nadie; ella llegó después del accidente. P.—Al cuanto tiempo más o menos llegó ella allí que usted viera después del accidente? R.—Ya lo teníamos dentro del carro, y entonces yo miré para atrás y estaba ella detrás de mí, pero en el momento del accidente ella no estaba. P.—En alguna forma ella ayudó a echar al herido al carro? R.—Bueno, yo

El acusado les admitió que él venía conduciendo el vehículo y que había atropellado a la víctima. Dijo el testigo que en el sitio había una dama, una joven trigueña y luego iban llegando más personas. Observó que en la carretera había huellas de frenos. Del sitio donde estaba el herido hacia las ruedas delanteras del vehículo midieron 25 pies. Había huellas de sangre en la grama que hay al borde de la carretera. No observó si el vehículo tenía algún desperfecto palpable. Repreguntado, manifestó que no sabía cómo había ocurrido el accidente; que al llegar al sitio estaban recogiendo al he-

creo que ella ayudó a colocar los pies porque tenía un pie para allá y otro para acá y ella ayudó a colocarle los pies dentro del automóvil, pero al momento del accidente no estaba ella allí. . . . . . P.—Ahora, usted le asegura al Tribunal que usted no vio en el momento en que ocurrió el accidente? R.—No, señor; yo no vi nada; yo sentí el impacto nada más. P.—Y no vio allí tampoco cuando usted llegó a esta señora Cándida Soltrén? R.—Allí no había nadie en ese sitio."

Repreguntando nuevamente por el Fiscal el testigo se ratificó en que en el momento del accidente allí no había nadie inclusive él mismo, y al insistir el Fiscal que por qué él se atrevía a asegurarle al Tribunal que la testigo Soltrén no estaba allí cuando ocurrió el accidente, el récord demuestra: "Hon. Juez. La pregunta es que si usted dice que cuando siente el impacto usted está en una hamaca en su casa cómo usted puede asegurar que esa testigo no estaba allí en el sitio del accidente. El Fiscal le pregunta cómo, si cuando usted siente el impacto usted dice que usted está en su casa recostado en una hamaca, usted puede asegurarle al Tribunal y a los Señores del Jurado que en ese momento no estuviera esta señora Doña Cándida Soltrén allí en el sitio del accidente? R.—Yo quiero acabarle de explicar; yo no lo había querido decir hasta ahora; esa doña estaba en casa arriba hablando con nosotros, y ella se quedó arriba hablando; cuando sucedió este asunto esa doña estaba arriba hablando con mi doña y mi suegra; ella estaba arriba." A preguntas de que por qué no le había dicho eso al Fiscal Torres en la investigación, dijo el testigo: "Yo le voy a aclarar; a ella la llamaron primero y la declaración de ella fue una cosa ligera, y entonces cuando me llamaron a mi no me dejaron acabar de hablar; yo no pude decir nada y me quedé callado pero esa doña estaba arriba en casa. P. [Fiscal] Y hoy es el primer día que usted lo dice? R.—Sí, señor; porque ella insiste en decir que estaba allí y ella no estaba allí." A preguntas de la defensa volvió a manifestar el testigo: "P.—Y usted le asegura al Tribunal y a la Dama y a los Caballeros del Jurado que esa es la verdad? R.—Sí, señor; esa es la verdad; yo juro ante Dios y ante el mundo que ella estaba arriba en casa."

Algunas manifestaciones de la señora Soltrén así como ciertos otros detalles de su testimonio indican que este testigo pudo estar en lo correcto. Sin embargo, no intervenimos con el tratamiento que el Jurado pudo haberle dado a la situación.

rido; que la dama que vio allí siguió con el chófer y que no recuerda haber visto alguna otra mujer allí; que mientras lo acomodaban seguían llegando personas; que no sabe si al ocurrir el accidente habría personas que pudieron haberlo visto; que en la investigación tomaron los nombres de las personas que había en el sitio; que recuerda el de un señor que estaba allí y mas tarde aquella señora (refiriéndose a los testigos Soltrén y Román) en el sitio de los hechos; que ella llegó más tarde y le dijo que había visto. Llamado por la defensa el policía Serrano manifestó que en el sitio específico donde sucedieron los hechos se podía conducir a una velocidad autorizada hasta de 45 millas por hora. Declaró que al llegar allí momentos después del accidente no vio en ese momento vehículos transitando en dirección contraria o en la misma dirección; que la carretera allí es ancha; la carretera militar.

La prueba de defensa fue al efecto de que el acusado y una señora que le acompañaba estaban trabajando en esa zona en un programa de anuncio de la mantequilla "Imperial". No estaban vendiendo ni entregando el producto en ese momento, sí conociendo el lugar y la distribución o agrupación de las casas. Declaró la señora que sucedió todo de momento. La víctima venía por la derecha y en ese momento trató de cruzar. Venían a una velocidad de 20 a 25 millas. Vio a la testigo Cándida Soltrén en el sitio como a los 4 ó 5 minutos de suceder el accidente. En la trayectoria ella y el acusado hablaban del negocio. En el contrainterrogatorio dijo que ella vio a la víctima "demasiado cerca" como a 3 ó 4 pies y medio del automóvil; que allí la carretera es recta. A 500 metros del sitio del accidente se podía ver la carretera en cualesquiera de las dos direcciones.

El acusado declaró que iban a comenzar su trabajo de propaganda cuando ocurrió el accidente. Vio a la víctima que iba por la orilla de la carretera en su misma dirección; en ningún momento se imaginó que fuera a meterse en la carretera de momento; que lo vio y "tocó" como de costumbre pero siguió porque no se imaginó que fuera a cruzar; que muy cerca

del carro ya, como a unos diez o quince pies, no sabe si porque se asustó o por el ruido del carro, la víctima trató de cruzar y al virarse hacia la izquierda lo arrolló con la parte delantera de la esquina del carro y cayó hacia el lado del paseo. Declaró que no iba mirando las millas pero calculaba que iba a una velocidad de unas 25 millas por hora. A preguntas del Fiscal dijo que vio a la víctima por primera vez como a 50 ó 100 pies de distancia; que todo el tiempo él estuvo mirando la carretera hasta que ocurrió el accidente. Que momentos antes del mismo un carro que cree era de la policía se cruzó con él en dirección contraria. La carretera allí es bien ancha y recta. De la línea media de la carretera hacia la orilla calcula que habrían 8 pies y que el vehículo tendría como 5 pies de ancho; que iba entre medio de la orilla y la línea blanca; que la víctima estaba en la orilla pero cruzó de momento hacia el medio de la carretera; que siempre que ve a una persona en la orilla toca "claxon" y en esta ocasión lo tocó; que la víctima no hizo nada al oir la bocina; fue después de dar aviso que la víctima cruzó hacia la izquierda; que llevaba una velocidad moderada y siguió igual; que la víctima le cruzó muy cerca del carro a 10 ó 15 pies y al mismo tiempo que paró le dio. Contestando preguntas sobre la naturaleza de los golpes dijo que a 15 millas se puede desbaratar a una persona con un carro, que es metal. La víctima, al sufrir el impacto se sesgó hacia el lado derecho y cayó a 5 ó 6 pies de la orilla. Al ocurrir el accidente no se paraban en ninguna casa, estaban mirando el sitio que iban a trabajar. A preguntas en cuanto a la posibilidad de que la víctima pudiera cruzar repentinamente la carretera, contestó que no se imaginó que fuera a cruzar. ▬

El Art. 203 del Código Penal dispone que homicidio es dar muerte ilegal a un ser humano sin malicia, y que es involuntario, cuando ocurre en la realización de un acto ilegal, que no constituyere delito grave; o en la realización de un acto legal que podría ocasionar muerte, de una manera ilegal o sin la debida prudencia y circunspección. Según el Art. 11

del propio Código, en todo delito o delincuencia **pública deberá** existir unión o simultaneidad entre el acto y la intención o *la negligencia* criminal. La palabra *negligencia,* según el Art. 559 del Código Penal, implica la falta de esa atención a la naturaleza o probables consecuencias del acto u omisión, que por lo ordinario presta una persona al obrar en asuntos que privadamente le conciernen. Y la Ley de Automóviles y Tránsito vigente al ocurrir los hechos disponía que la velocidad de un vehículo de motor se regularía con el debido cuidado, teniendo en cuenta el *ancho, tránsito, uso* y *condiciones* del camino, prohibiendo guiar a una velocidad mayor que la que permitiera ejercer el debido dominio del vehículo y reducir la velocidad o parar cuando fuera necesario para evitar atropellar una persona . . . etc . . . ■

La prueba del acusado tendió a demostrar que el accidente ocurrió debido al proceder de la víctima que de momento intentó cruzar la carretera a poca distancia del frente del vehículo sin que, a pesar de que paró, le fuese posible el evitar atropellarla. En sus instrucciones la Sala le manifestó al Jurado lo siguiente: "Es indudable que la negligencia de la víctima puede alegarse por el acusado como defensa, y es indudable también que si se alega por el acusado y se prueba su existencia; o si resulta evidente de la misma prueba del Fiscal, puede tomarse en consideración para graduar la responsabilidad del acusado; pero para que tal negligencia constituya una excusa completa y pueda eximir totalmente de responsabilidad al acusado, tiene que ser de tal naturaleza que lleve al ánimo del juzgador el convencimiento de que *mas que negligencia contribuyente* fue la *única* productora del daño". ■

La anterior instrucción fue una correcta exposición de la doctrina vigente. En esas mismas palabras expusimos el principio en *Pueblo* v. *Francis,* 19 D.P.R. 692, a la página 698. En más o menos iguales términos lo hemos repetido en *Pueblo* v. *Guadalupe,* 62 D.P.R. 262; *Pueblo* v. *Rivera,* 65 D.P.R. 319, 321; *Pueblo* v. *Andino,* 78 D.P.R. 782, 788. Y véanse: *State*

v. *Romero*, 69 N.W. 187, 365 P.2d 58, 60; *Coate* v. *State* (Tex), 306 S.W.2d 727, 729; *Anderson* v. *State* (Ala.), 120 So.2d 397, 401; *Commonwealth* v. *Root* (Pa.) 156 A.2d 895, 899; *People* v. *Hoe* (Cal.) 330 P.2d 907, 912. Fue necesaria la regla para evitar confundir el campo de la responsabilidad penal con el principio,—en gran parte ya repudiado también en el área de la responsabilidad civil,—de que la negligencia con que pudo contribuir un perjudicado exoneraba en un todo al productor del daño, no importa cuán culposamente éste hubiera también actuado. El principio antes expuesto no es incompatible, sin embargo, con este otro principio clásico en el campo de lo penal, ni impide su aplicación: el de la presunción de inocencia que con categoría de mandato constitucional hemos dispuesto que deberá gozar todo acusado en un proceso criminal.[2] Abstracción jurídica ésta que toma cuerpo y realidad práctica a través de la norma de ley de que a todo acusado se le deberá probar su culpabilidad más allá de duda razonable y fundada, y si hubiere duda razonable en cuanto a ella, se le deberá absolver. Consecuencia de ello es que allí donde la prueba del Pueblo en un proceso criminal no sea de tal naturaleza insuficiente como para que proceda una absolución perentoria como cuestión de derecho, un acusado viene obligado a aportar sólo aquella prueba que produzca en la mente del juzgador un estado de duda razonable en cuanto a su culpabilidad. Si lograre establecer tal estado el mandato de ley dispone su absolución. *Everett* v. *State* (Ariz.), 356 P.2d 394, 397; *Davis* v. *State* (Ala.), 112 So.2d 353, 354; *Commonwealth* v. *Bonomo* (Pa.) 151 A.2d 441, 445; *State* v. *Brennan* (Ohio), 88 N.E.2d 281, 284; *State* v. *Walker* (N.J.), 166 A.2d 567, 574; *State* v. *Larrabee* (Me.), 161 A.2d 855, 859; *State* v. *Hubbard* (Mo.), 171 S.W.2d 701, 707; Cfr. *Pueblo* v. *Túa*, 84 D.P.R. 39 (1961), y casos citados en su escolio 4. ■

---

[2] Constitución del Estado Libre Asociado, Art. II, sec. 11.

Si bien es cierto que para la responsabilidad sustantiva bajo el Art. 203 del Código Penal por la muerte de un ser humano basta con la negligencia lisa tipo corriente sin especiales características, según resolvimos en *Pueblo* v. *López*, 77 D.P.R. 607, en el proceso penal determinante de dicha responsabilidad hay que atenerse a las normas aludidas. Sin que resulte en conflicto con el principio enunciado, que excluye como factor de exoneración la negligencia con que pudo haber contribuido el perjudicado, si del conjunto total de la prueba y demás circunstancias resultare una situación de duda razonable y fundada en cuanto a si el daño se debió a negligencia del acusado o a negligencia de la víctima, el acusado es acreedor al beneficio de esa duda.

En las circunstancias presentes en que ocurrió el hecho según surge de la prueba misma del Pueblo:—la víctima caminando por la orilla de una carretera ancha y recta, en buenas condiciones, el pavimento seco y un día claro de sol, sin otros vehículos en una u otra dirección ni obstáculos que se interpusieran, sin que la prueba contenga demostración alguna o indicio de que el vehículo abandonara la zona de rodaje,—la versión de por qué ocurrió el accidente ofrecida por el acusado no es de tal grado irreal o inconcebible a la luz de esas circunstancias que pudiera ser eliminada de manera absoluta como una hipótesis racional de la ocurrencia, descartando toda posibilidad de que así pudiera haber sido, aunque siempre era de la competencia del Jurado el darle o no crédito. Al acusado se le imputó conducir con tanta negligencia, descuido y falta de circunspección, a exceso de velocidad, sin tomar en cuenta las *condiciones* y *ancho* de la carretera, que causó la muerte. La velocidad permisible en aquel lugar era de 45 millas por hora. Ello no quiere decir, según tantas veces hemos expresado, que el conductor actuara con la debida prudencia y circunspección y no fuera negligente por el hecho de que no excediera el límite permisible. Tampoco, las condiciones del lugar según se han descrito, en las circunstancias allí presentes, demuestran por sí mismas que fuera impru-

dencia el correr hasta el límite legalmente permisible de velocidad. ■

Este caso, en sus rasgos generales, guarda bastante similitud con el de *Pueblo* v. *Pérez*, 79 D.P.R. 487, en el que revocamos la sentencia condenatoria, y puede decirse que en ciertos aspectos esenciales como el relativo a la prueba de la velocidad éste compara de manera más favorable al acusado. Los criterios expuestos en el caso de *Pérez* en torno a una situación parecida, son fundamentalmente aplicables al de autos. Asumiendo que el Jurado no diera crédito a la prueba de defensa, la de cargo,—aparte de como resolviera el conflicto de la misma en cuanto a si el único testigo aparentemente ocular presenció o no el hecho,—resulta insuficiente a la luz de los criterios de derecho expuestos en el referido caso de *Pueblo* v. *Pérez*. Si bien una velocidad excesiva puede deducirse por las consecuencias del impacto cuando ocurre un choque, como hemos dicho en *Pueblo* v. *Rivera*, 69 D.P.R. 538 y en *Pueblo* v. *Busigó*, 78 D.P.R. 172 (ambos casos de colisiones con otros objetos bajo el Art. 328 del Código Penal), el choque de un cuerpo sólido de acero y hierro como lo es un automóvil con un cuerpo de menor consistencia como el ser humano tiene que producir golpes violentos y de graves consecuencias aun cuando no se trate de una velocidad excesiva o exagerada. ■

La negligencia y culpabilidad del acusado había que establecerlas más allá de duda razonable. Duda razonable es una duda razonada, producto mental de la raciocinación sobre todos los elementos de juicio envueltos. Analizando todos esos elementos de juicio que ofrece la prueba, ya en conjunto o ya únicamente la de cargo con la plena credibilidad que a ésta pudo darle el Jurado, a la luz de la norma de derecho aplicable no creemos que El Pueblo probara su caso, cuando menos, más allá de una duda fundada.

*Se revocará la sentencia condenatoria y se dictará otra absolviendo al acusado.*