Per Curiam

*891 TEXTO COMPLETO DE LA SENTENCIA
El apelante, Ing. Jose A. Camacho, nos solicita que revisemos las sentencias dictadas por el Tribunal de Primera Instancia, Sub-sección de Distrito, Sala de San Juan, en las que se le declaró convicto en tres (3) cargos de expedición de cheques sin provisión de fondos, infracciones al Art. 264 del Código Penal, 33 L.P.R.A. see. 4551. A tenor con dichos dictámenes, el tribunal recurrido le impuso al apelante una multa de quinientos dólares ($500) en cada caso.
Hemos examinado detenidamente los alegatos de las partes, la transcripción de la vista oral y el expediente del Tribunal de Primera Instancia, incluyendo la prueba documental admitida en evidencia, y concluimos que proceden las revocaciones de las sentencias condenatorias, toda vez que no se estableció la intención de defraudar, más allá de duda razonable.
I
El 10 de noviembre de 1993 Prime Investment, Inc., representada por su presidente, Sr. Calixto Deniz Márquez, y su vicepresidente, Sr. Osvaldo Luis Acevedo Molina, opcionó la compra de una finca de 13.78 cuerdas propiedad del Sr. Francisco Cardona y su esposa, ubicada en el Barrio Gurabo Arriba del Municipio de Juncos. Para dicha finca, la Administración de Reglamentos y Permisos (ARPE) había aprobado un proyecto de viviendas. El precio convenido para la adquisición de la propiedad, incluyendo todos los planos, derechos y otros relacionados al desarrollo de ésta, fue de trescientos setenta y cinco mil dólares ($375,000). El costo de la opción fue de cuarenta mil dólares ($40,000), los cuales serían abonados al precio de venta si se ejercía la misma.
De acuerdo con la cláusula número seis (6) del contrato de opción, el balance del precio pactado sería pagadero de la siguiente forma: el vendedor recibiría ciento sesenta y siete mil quinientos dólares ($167,500) al firmarse la escritura de segregación y compraventa y, ademas, recibiría un pagaré por la suma de ciento sesenta y siete mil quinientos dólares ($167,500) el cual estaría "garantizado con una primera hipoteca a favor de[l] VENDEDOR sobre otras propiedades de la corporación y no sobre la finca transferida." En el contrato de opción no se especificó el vencimiento del pagaré.
El 10 de octubre de 1994 se otorgó ante el notario Ovidio Zayas Rivera, la escritura denominada Segregación, Compraventa y Descripción de Remanente sobre el inmueble antes referido.
En ésta comparecieron como vendedores el Sr. Cardona y su esposa y, como comprador, Colinas de Juncos S.E., representada por su socio gestor y administrador, el Sr. Calixto Deniz Márquez. En el primer dispositivo sobre las cláusulas y condiciones de dicha escritura, se describió el objeto del contrato de la siguiente forma:

"LOS VENDEDORES" venden, ceden y traspasan en las proporciones en que son dueños cada uno según consta en el registro de la Propiedad, a favor de "LA COMPRADORA", el inmueble antes descrito con todos sus usos, anexos, servidumbres y pertenencias para que ésta la posea y la disfrute como su única y legítima dueña así como todos los derechos, planos, estudios, permisos y endosos de agencias de gobierno, y otros derechos del Proyecto aprobado por ARPE bajo el nombre de Reparto Cardona de Juncos, Puerto Rico."

En la escritura se hizo constar que del precio convenido de trescientos setenta y cinco mil dólares ($375,000) por la compraventa, los vendedores habían recibido, previo a su otorgamiento, la suma de cuarenta y cinco mil dólares ($45,000), y que ese día recibían trescientos treinta mil dólares ($330,000), para completar la totalidad del precio. Sin embargo, de acuerdo a lo declarado por el Sr. Cardona ante el tribunal apelado, éste recibió el día en que se otorgó la escritura un cheque por ciento sesenta y siete mil quinientos dólares ($167,500) de Doral Mortgage, tres (3) cheques librados por el Ing. Camacho, numerados 1537, 1538 y 1539, por las cantidades de cincuenta y dos mil quinientos dólares ($52,500) los primeros dos y por diez mil dólares ($10,000) el último, totalizando ciento *892 quince mil dólares ($115,000), doce (12) giros de American Express por un total de doce mil dólares ($12,000) y otro cheque de alrededor de veinte mil dólares ($20,000). 
Conforme al testimonio del Sr. Cardona, al día siguiente de la firma de la escritura él depositó todos los cheques en su cuenta con el Banco Popular, excepto los cheques Núms. 1537 y 1538, girados por el Ing. Camacho, por la suma de cincuenta y dos mil quinientos dólares ($52,500) cada uno. El cheque Núm. 1539, por la suma de diez mil dólares ($10,000), fue devuelto por el banco debido a insuficiencia de fondos.
El 30 de noviembre de 1994, a los cincuenta y un (51) días de recibidos los cheques, el Sr. Cardona depositó por primera vez los cheques Núms. 1537 y 1538 y, además, redepositó el cheque Núm. 1539. Estos les fueron devueltos por el banco debido a insuficiencia de fondos.
Mientras tanto, el desarrollo del proyecto confrontó problemas en enero de 1995, debido a ciertos reclamos de los accionistas principales de la corporación M.P.M., Inc., titulares de un terreno colindante al mismo. En el año 1992 dichos colindantes acordaron cederle al Sr. Cardona aproximadamente 480 metros cuadrados de terreno para ensanchar la vía de entrada al proyecto, según requerido por ARPE, a cambio de la asistencia de este último en otros proyectos de ellos. Ahora M.P.M., Inc. objetaba las obras que realizaban los nuevos desarrolladores en el terreno que se iba a ceder.
Luego de varias reuniones y correspondencia entre M.P.M. Inc. y el Ing. Camacho, en relación a lo anterior, este último le escribió una carta al Sr. Cardona, fechada 10 de febrero de 1995, exponiendo, entre otros aspectos, lo siguiente:

"Deseo ratificarte que no tengo obligación alguna para con el colindante y dueño de la entrada de acceso y el camino municipal, la corporación M.P.M. del Lie. Moreda. Este ensanche en dicha propiedad es requerimiento indispensable para poder construir el proyecto que tu vendiste con todos los permisos y aprobaciones necesarias para construir."

El día 31 de enero, el Lie. Moreda por medio de un emplazador emplazó a mi compañía y a este servidor para que detuvieran todos los trabajos bajo amenazas de radicar un "Injunction" paralizando el proyecto. Me he reunido contigo a tales efectos y tu posición es ninguna, el proyecto continúa parado y como tú sabrás ya muchas casas están vendidas y todo el movimiento de tierra hecho; pero sin acceso no hay proyecto. ' -

El reclama que tú y el Ing. Jiménez Montes se comprometieron a hacerle varios trabajos y conseguirle permisos de urbanización, como tu sabes estos compromisos son entre ustedes y son del mes de mayo de 1992. En todo este caso yo soy un tercero y no soy responsable de tus compromisos contraídos para esa fecha e inclusive nunca me habías hablado sobre el particular. Esos terrenos (ensanche) tienen que ser transferidos y cedidos en escrituras al Estado, sin eso no hay proyecto."

El 16 de febrero de 1995, seis (6) días después de la fecha de la comunicación anterior, el Ing. Camacho recibió una carta de interpelación del Sr. Cardona, en relación a los cheques Núms. 1537, 1538 y 1539.
Luego, el 27 de marzo de 1995, el Sr. Cardona presentó una querella ante la Policía, lo que dio lugar a que se radicaran tres denuncias contra el Ing. Camacho por violaciones al Art. 264 del Código Penal, supra. El 1ro. de abril de 1995 el Tribunal de Primera Instancia determinó causa probable contra el Ing. Camacho.
En el juicio, celebrado el 22 de septiembre de 1995, el Ministerio Público presentó como testigo de cargo al Sr. Cardona. Este negó haber recibido la carta del 10 de febrero de 1995; no obstante, aceptó haber participado acompañado de su abogado, Ledo. Jorge Manrique, en una reunión con el Ing. Camacho para discutir la situación surgida sobre la cesión del terreno y las obras de ensanche. Además, en cuanto a los cheques que dieron lugar a las acusaciones, testificó lo siguiente:

*893
"Fiscal: Vamos a ver. A usted el 10 de octubre le dan tres cheques, ¿se acordó algo, que usted recuerde, en relación al cobro de ese cheque, de esos tres cheques en particular?

Sr. Cardona: Negativo.

Fiscal: ¿Ah?

Sr. Cardona: Negativo.

Fiscal: Negativo, ¿que quiere usted decir con negativo?

Sr. Cardona: Bueno, que no se acordó nada. Al mismo momento que yo recibí todos mis cheques yo me los metí en mi bolsillo y me fui." T.E., pág. 12.
Por su parte, la defensa presentó como testigo al Ledo. Ovidio Zayas Riveras. En esencia, éste declaró que lo acordado por las partes al firmarse el contrato de opción era que el pagaré se satisfacerla en dieciocho (18) meses, T.E., pág. 41, y que los cheques en controversia fueron emitidos para evidenciar la deuda y no para cobrarse inmediatamente, T.E., págs. 41 y 48.
Concluido el juicio, el tribunal apelado dictó sentencias en las que declaró convicto al Ing. Camacho de las tres acusaciones relacionadas a las violaciones al Art. 264 del Código Penal, supra, y le impuso una multa de quinientos dólares ($500), más las costas, en cada una. No conforme, apeló ante este Foro aduciendo que el tribunal apelado incidió toda vez que no se probó la intención de defraudar, más allá de duda razonable.
El Art. 264 del Código Penal, supra, por cuyas infracciones fue acusado el Ing. Camacho, dispone: 

"§ 4551. Insuficiencia de fondos

Toda persona que con el propósito de defraudar a otra haga, extienda, endose o entregue un cheque, giro, letra u orden para el pago de dinero, a cargo de cualquier banco u otro depositario, a sabiendas de que el emisor o girador no tiene suficiente provisión de fondos en dicho banco o depositario para el pago total del cheque, giro, letra u orden a la presentación del mismo, ni disfruta de autorización expresa para girar en descubierto, será sancionada con multa hasta el doble del importe de dicho cheque, giro, letra u orden, pero nunca mayor de quinientos dólares, o reclusión de un día por cada dólar que deje de satisfacer hasta un máximo de noventa días, o ambas penas a discreción del tribunal." (Enfasis suplido.)
En Caballero v. Tribunal Superior, 81 D.P.R. 689, 695 (1960), el Tribunal Supremo discutió el delito de expedir cheques sin fondos, de la siguiente manera:
"...El propósito de defraudar es la médula del delito de expedir cheques sin fondos o créditos. Valentín v. Torres, 80 D.P.R. 463, 477 (1958); Pueblo v. Cuevas, 54 D.P.R. 301, 304 (1939); People v. Peyton, 112 C.A.2d 648, 246 P.2d (1952). Lo único que releva de responsabilidad criminal al librador es el pago del cheque dentro del plazo de requerimiento para el pago a que se refiere la see. 4 de la citada Ley Núm. 26. Claro, que no se nos escapa de la mente la situación en que el cheque no ha sido pagado por exclusiva culpa u omisión de la persona a cuyo favor se libra o endosa o que ella haya sido advertida o tenga conocimiento de la falta o insuficiencia de fondos o créditos, ni por actos u omisiones del banco girado y aquellos casos en que las circunstancias concurrentes no revelan propósito alguno de defraudar. En tales casos el estatuto penal puede aparecer técnicamente infringido, pero no existe razón para imputar fraude al librador." Cf. Pueblo v. Cuevas, supra; Pueblo v. Loubriel, 55 D.P.R. 1004 (1939). (Enfasis suplido.)
El Art. 14 del Código Penal, 33 L.P.R.A. see. 3061, establece que nadie podrá ser sancionado si al cometerse el acto que constituye delito, no está presente el elemento mental de intención o negligencia criminal. Para determinar si un delito requiere intención o negligencia, hay que acudir a las disposiciones específicas que lo tipifican. A tales efectos nos dice el Tribunal Supremo en Pueblo v. *894 Flores Betancourt, 124 D.P.R. 867, 876 (1989), lo siguiente:
"... Para determinar si un delito es de intención o de negligencia hay que acudir a su tipificación en la parte especial del código. Términos tales como "a sabiendas", "fraudulentamente", "maliciosamente", "voluntariamente", etc., denotan delitos intencionales o dolosos.... Además de necesitar esta intención general, algunos delitos requieren cierta intención específica para quedar constituidos."
Sobre la intención requerida para que se constituya una violación al Art. 264, supra, más adelante, a la pág. 880 de dicha opinión, el Tribunal Supremo añadió:
"... Si examinamos los delitos contra la fe pública tipificados en el Código Penal, Arts. 264-276, (33 L.P.R.A. secs. 4551-4596), notamos que todos los que requieren como elemento constitutivo la intención específica de defraudar incluyen en su definición la frase siguiente: "Toda [o 'cualquier'] persona que con la intención [o 'el propósito'] de defraudar a otra...."
Por lo tanto, para que se constituya una violación al Art. 264, supra, es necesario que el actor tenga la intención específica de defraudar. El Art. 15(a) del Código Penal, 33 L.P.R.A. see. 3062, indica que una persona actúa con intención específica en la comisión de un delito cuando el resultado ha sido previsto y querido por la persona como consecuencia de su acción u omisión. En Pueblo v. Narváez Narváez, 122 D.P.R. 80, 90 (1988), el Tribunal Supremo expresó sobre este particular que " [s]e trata de aquella situación en que la persona tiene un deseo expreso de efectuar el acto y quiere la producción del resultado, el cual ratifica con su actuación."
En Pueblo v. Flores Betancourt, supra, se establece que:
"El proceder "fraudulentamente" significa actuar "mediante ardid, simulación, trama, treta o mediante cualquier forma de engaño". Art. 7(15) del Código Penal, L.P.R.A. see. 3022(15). "Defraudar" quiere decir privar a una persona de un bien, derecho o interés "con abuso de su confianza o con infidelidad a las obligaciones propias". Diccionario de la Lengua Española, 19na ed., Madrid, Ed. Espasa-Calpe, 1970, Vol. I, pág. 427. (Enfasis suplido.)
En Caballero v. Tribunal Superior, supra, a las págs. 697 y 698, el Tribunal Supremo comenta sobre el significado de la "intención específica de defraudar", en la expedición de cheques sin fondos, de la siguiente manera:

"El fraude, sinónimo de engaño, consiste en la falsa representación, mediante palabras o por actos, de hechos materiales, por la cual una persona de razonable discreción y confianza es inducida a actuar a su perjuicio; en la supresión de hechos materiales que una persona está legalmente obligada a revelar a otra." Véanse: 1 Story Equity Jur., sec. 186, y C. 6; Bouvier's Law Dictionary, Vol. 1, pág. 843.

La médula del delito [de expedir cheques sin fondos], como antes expusimos, es el propósito de defraudar. Todo lo que hemos resuelto respecto a este delito es que si el que recibe el cheque tiene conocimiento de que su emisor no tiene fondos para pagarlo, no puede existir el propósito de defraudarlo, y que para determinar la existencia del elemento sicológico del delito, o sea el ánimo de engañar para obtener un lucro ilícito, deben tomarse en consideración las circunstancias concurrentes de cada caso. "(Enfasis suplido.)
La apelación de las sentencias dictadas se basa en que el Ministerio Fiscal no probó la comisión del delito, más allá de duda razonable. En vista de ello, debemos examinar si considerando las circunstancias concurrentes, se estableció más allá de duda razonable que el imputado tenía la intención específica de defraudar.
La intención es un elemento mental por lo que, en ausencia de manifestaciones del imputado que reflejen su estado anímico, sólo puede establecerse con prueba de todas las circunstancias relacionadas *895 con la comisión del delito y de la conducta del imputado. El uso de evidencia circunstancial para esta-blecer el elemento de intención ha tenido amplia discusión en el derecho probatorio angloamericano. Véase, 1 Wigmore, On Evidence (3rd. ed.), secs. 38 a 465. Nuestro Tribunal Supremo, en Pueblo v. Torres Nieves, 105 D.P.R. 340, 346-347 (1976), resumió los conceptos allí elaborados de la siguiente forma:
"... En Pueblo v. Ortiz Rodríguez, 100 D.P.R. 972, 979 (1972), sintetizamos la clasificación tripartita de circunstancias susceptibles de ser evaluadas y consideradas en la determinación de la culpabilidad de un acusado del siguiente modo:

"(a) circunstancias prospectivas: hechos anteriores al crimen y que apuntan hacia su futura comisión (motivo, plan, preparativos, etc.);

(b) circunstancias concomitantes: hechos simultáneos al crimen que permiten que se lleve a cabo por el acusado (presencia en el lugar del crimen, acceso a la víctima, etc.);

(c) circunstancias retrospectivas: hechos posteriores al crimen que sugieren que el acusado lo cometió (fuga, ocultación de evidencia, etc.)."

Adicionalmente señalamos "... circunstancias que tienden a probar la inocencia de un acusado, verbigracia, el afecto o amistad entre el acusado y la víctima (prospectiva), la coartada (concomitante) y una conducta normal con posterioridad al crimen (retrospectiva)."; y "... el que exista un motivo comprobado para el crimen, tal como el lucro, la venganza o la cólera producida por una riña." Págs. 979, 981-982. Ninguna de estas circunstancias inculpatorias o exculpatorias, por sí solas serán determinantes, sino que la culpabilidad o inocencia quedará expuesta en orden a un ponderado análisis integral de las mismas y de las inferencias lógicas y razonables que pueden derivarse de los hechos básicos establecidos, y ello siempre con sujeción a la medida de prueba de duda razonable." (Enfasis suplido.)
En Pueblo v. Cabán Torres, 117 D.P.R. 645, 652 (1986), el Tribunal Supremo elaboró el concepto de prueba más allá de duda razonable como sigue:
Ahora bien, es principio fundamental de nuestro sistema de derecho que la culpabilidad de un imputado de delito debe ser probada más allá de duda razonable. Pueblo v. Ortiz Morales, 86 D.P.R. 456 (1962); Pueblo v. Carrasquillo Carrasquillo, 102 D.P.R. 545 (1974). El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente"; esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria"; es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido. (Cita omitida.) Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada". Pueblo v. Toro Rosas, 89 D.P.R. 169 (1963). (Enfasis en original.)
Veamos ahora, a la luz de las doctrinas anteriores, si erró el Tribunal de Primera Instancia al determinar que se probó, más allá de duda razonable, la intención específica de defraudar por parte del apelante. 
Para probar la intención de defraudar el Ministerio Público descansó principalmente en el testimonio del Sr. Cardona quien, en esencia, declaró que no se acordó nada en relación a la fecha en que se cobrarían los cheques. Este testimonio fue contradicho por el Ledo. Zayas, quien declaró que los cheques eran para evidenciar la deuda restante del precio de venta de trescientos setenta y cinco mil dólares ($375,000). Los cheques se irían librando, o sea, pagando según se fuesen obteniendo fondos del préstamo de construcción para el desarrollo de la urbanización. T.E., págs. 41, 43 y 48. Este testigo tenía conocimiento personal de lo transcurrido durante el proceso de negociación y no tenía interés directo en la controversia sobre el cobro de los cheques.
Por otro lado, tampoco se desprende de la transcripción de la evidencia oral que se hubiese presentado prueba que reflejase la utilización por parte del apelante de ardid, simulación, trama, treta, *896 o cualquier forma de engaño en las negociaciones sobre la adquisición del inmueble en este caso. La evidencia testifical presentada por el Ministerio Fiscal, aun adjudicándole credibilidad, no fue prueba "suficiente en derecho", o sea tal que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido, de la intención específica de defraudar. Si examinamos cuidadosamente las circunstancias prospectivas, concomitantes y retrospectivas, en relación a los hechos que dieron lugar a la expedición de los cheques, encontramos que las mismas son inconsistentes con la conclusión de que el apelante actuó con la intención requerida en la tipificación del delito.
No existe una explicación razonable para la expedición de tres cheques para pagar la suma de $115,000, en lugar de un sólo cheque por el total envuelto. El girar tres cheques establece una duda razonable si verdaderamente el acuerdo entre las partes era que los mismos se cobraran inmediatamente o posteriormente, según se conseguían los fondos para cubrir los mismos.
En adición, nos llama la atención que la obligación del comprador, según el contrato de opción, era pagar la mitad en efectivo y expedir un pagaré por los restantes $167,500. Del expediente y la prueba testifical, no surge explicación alguna porqué el apelante estaría dispuesto a librar cheques, a ser cobrados inmediatamente, para satisfacer tal obligación.
Observamos, además, que al día siguiente de la firma de la escritura el Sr. Cardona fue al banco y depositó todos los cheques recibidos el día anterior, excepto los dos cheques por las sumas de $52,500. Lo más lógico hubiese sido que el Sr. Cardona depositase todos los cheques lo más pronto posible para así tener los fondos disponibles contra los cuales girar o para invertir, particularmente, aquellos que eran de unas cuantías sustanciales.
Finalmente, no podemos ignorar el hecho que el Sr. Cardona no volvió a depositar los cheques, ni presentó interpelación escrita al apelante, sino hasta después de surgido el problema que enfrentaba el proyecto, debido a la objeción del colindante, M.P.M., Inc., a que se efectuase el ensanche de la vía de entrada al proyecto, según previamente acordado con el Sr. Cardona. Este último atendió, acompañado por su abogado, una reunión para discutir esta situación. Poco después de esta reunión, es que éste presenta la carta de interpelación. En ese momento ya habían transcurrido cuatro meses desde que se habían expedido los cheques, y más de dos meses que los mismos fuesen devueltos por el banco.
Aunque la determinación de culpabilidad que hace el juzgador de los hechos a nivel de instancia, es merecedora de gran deferencia por los tribunales apelativos, ello no es óbice para dejar sin efecto un fallo condenatorio cuando el análisis ponderado de la prueba desfilada ante el Tribunal de Primera Instancia produce una duda razonable y fundada sobre la culpabilidad del acusado. Pueblo v. Somarriba García, supra, pág. 9869. Como expresó el Tribunal Supremo en Pueblo v. Cabán Torres, supra, pág. 655, "hasta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila."
Al considerar la totalidad de la prueba concluimos que, aun interpretándola en la forma más favorable al Ministerio Fiscal, ésta no es suficiente para producir la certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido de que el apelante actuó con la intención específica de defraudar. Incidió el Tribunal de Primera Instancia al declarar culpable al apelante.
Por las consideraciones antes mencionadas, se revocan las sentencias condenatorias.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
*897 ESCOLIOS 97DTA25
1. Se hizo constar en el acuerdo de opción que la finca incluía una "Autorización de Plano de Desarrollo Preliminar de sesenta y tres solares para Proyecto de Urbanización Residencial en el Municipio de Juncos, caso número 93-49A002CPD, consulta Referencia 92-49-0687 J.P. V."
2. De los autos no se desprende la razón por la cual la corporación que acordó la opción de compra, no fue la que adquirió posteriormente el inmueble.
3. Doral Mortgage inicialmente proveyó financiamiento para el proyecto, quedando garantizada su acreencia por una primera hipoteca sobre el inmueble.
4. Cabe señalar, que los desembolsos descritos en el testimonio del Sr. Cardona no concuerdan con la totalidad del precio de compraventa, ni con lo descrito en la escritura otorgada, como recibido ese día.
5. El Ledo. Zayas participó en los acuerdos relacionados a la opción de compra del inmueble, además de actuar como notario en la escritura de compraventa.
6. Lo citado es el texto vigente a la fecha en que se expidieron los cheques.
7. El Art. 266, 33 L.P.R.A. see. 4553, según interpretado en Pueblo v. Somarriba García, 131 D.P.R. (1992), 92 JTS 109, dispone, como requisito adicional, que se pruebe a satisfacción del tribunal que se le cursó una interpelación por escrito al girador del cheque en la que se le requirió que pagase la cantidad del cheque y que el girador no hizo el pago dentro del período dado para ello, el cual no será menor de diez días.
8. Los Arts. 264 a 268 del Código Penal, 33 L.P.R.A. sees. 4551 a 4555, incorporaron lo dispuesto en la Ley Núm. 26 de 1934, bajo la cual se decidió este caso. Al incorporarlos al Código Penal, estos artículos fueron objeto de pequeños cambios en redacción y en las penas, pero no sobre el rol central que ocupa el propósito de defraudar en la tipificación del delito.
9. En el caso de autos el apelante aceptó ante el Tribunal de Primera Instancia la suficiencia de la prueba para los siguientes elementos del delito imputado: (1) que se expidieron los tres cheques, sin que existieran fondos para cubrirlos; (2) que el librador de" los cheques, el apelante, conocía de la inexistencia de fondos y falta de autorización para girar al descubierto; (3) que éste no pagó el monto de dichos cheques, a pesar de haber recibido la interpelación para así hacerlo, según requerida por el Art. 266, supra.
10. Nuestra conclusión se basa en la totalidad del expediente. Los aspectos que discutimos a continuación son sólo algunos ejemplos de las consideraciones que nos llevan a la conclusión final en este caso.
11. Compárese la situación de autos con el elaborado ardid utilizado por el imputado en Caballero v. Tribunal Superior, supra. En dicho caso, luego de comprar "al contado" unas telas, el imputado se buscó los bolsillos, buscó en la gaveta del auto, etc., luego de lo cual le indicó al vendedor que le enviaría un cheque por correo. Posteriormente, al ser requerido del pago de cheque sin fondos, el librador del cheque vendió su negocio y se acogió a quiebra voluntaria en la Corte Federal.
12. Como contestación a la pregunta porqué se hicieron tres cheques en vez de uno, el Sr. Cardona se limitó a aseverar que esto fue "[i]dea del señor Camacho." T.E., pág. 20.
13. Los cheques librados por el apelante suman sólo $115,000, por lo que inferimos que el Sr. Cardona recibió la diferencia entre los $167,500 y $115,000 en efectivo o en cheques que cobró al otro día de firmarse la escritura.