EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JORGE RAMOS PIZARRO, acusado y apelante.

*Número:* CR-66-499      *Resuelto:* 10 de mayo de 1968

*E. Armstrong de Watlington, Enrique Miranda Merced* y *Edna Abruña Rodríguez,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Héctor R. Orlandi Gómez, Procurador General Auxiliar,* abogados de El Pueblo.

(11) En su alegato los apelantes aceptan que es procedente la reglamentación en cuanto a tiempo, lugar y volumen.

## SENTENCIA

El apelante fue convicto de robo perpetrado como consecuencia de un asalto a mano armada a la caja registradora de un negocio de restorán situado en el Barrio Sabana Seca de Toa Baja.

El único error señalado en esta apelación es que no se probó la culpabilidad del apelante más allá de duda razonable. El fundamento del error versa sobre la identificación del apelante.

La prueba de cargo demostró sin lugar a dudas que el asalto se perpetró por dos personas y que se cometió un robo de dinero. El empleado a cargo de la caja declaró que la persona que abrió ésta era alta y gruesa pero no podía identificarla por el rostro. Surge del récord que el apelante usaba un antifaz. Un segundo testigo identificó al apelante como la persona que sacó el dinero de la caja. Describió ante el jurado la forma en que llevaba el antifaz y qué parte de sus facciones, no obstante, eran visibles. Declaró cómo tenía el pelo, las cejas y las manos; dijo que la región de los ojos y la nariz eran visibles, las cejas muy abultadas y el pelo estirado y brilloso. A raíz de los hechos identificó al apelante de un grupo de fotografías que la policía le mostró. No obstante el fuerte contrainterrogatorio a que fue sometido, el testigo afirmó una y otra vez ante el jurado sin titubeos que el apelante era la persona que había cometido el robo.

El acusado no presentó prueba alguna. Antes, la Sala sentenciadora se había negado, como cuestión de derecho, a decretar su absolución a base de insuficiencia de prueba. Entendió la Sala que había prueba suficiente para que el jurado deliberara. Esta misma posición la asumió posteriormente al resolver una moción de nuevo juicio. El jurado lo declaró culpable del delito imputado. Se ha apelado de la sentencia y de estos fallos negando absolución y nuevo juicio.

Como cuestión de derecho, fue correcta la determinación de la Sala sentenciadora negándose a ordenar al jurado la absolución del apelante por insuficiencia de la prueba, y correcta también la negativa a conceder un nuevo juicio por igual fundamento. La prueba de cargo, no controvertida por ninguna otra, daba base para que el caso pasara a la consideración y deliberación del jurado. Siendo ello así, sólo quedaría en este caso la apreciación, credibilidad, peso y evaluación que el jurado dio a la prueba de cargo. No es nuestra función sustituir al jurado en ese menester. Por sobre la información que tenemos sólo de la transcripción de la evidencia oral, el jurado tuvo además el beneficio de ver al acusado, observar sus reacciones, evaluar al testigo, su manera de declarar, comparar, mirando al acusado, cuan correcta podía ser o no su identificación. No se produjo prueba de defensa que tendiera a desvirtuar el testimonio que oyera y observara. Son las dudas del jurado las que debían ser vencidas en cuanto al grado y extensión en que se había o no producido una identificación del apelante. El jurado fue debidamente instruido sobre el particular, la duda razonable, y así instruido resolvió sus dudas y dio su fallo. No hay base para intervenir en apelación, con el mismo.

Se confirma la sentencia dictada por la Sala de Bayamón del Tribunal Superior en 29 de septiembre de 1964 que condenó al apelante por el delito de robo.

Así lo pronunció y manda el Tribunal y firma el Señor Juez Presidente, quien no intervino.

Los Jueces Asociados Señores Pérez Pimentel y Ramírez Bages disintieron en opinión separada.

(Fdo.) Luis Negrón Fernández

*Juez Presidente*

Certifico:

(Fdo.) Joaquín Berríos

*Secretario*

Opinión disidente del Juez Asociado Señor Ramírez Bages en la cual concurre el Juez Asociado Señor Pérez Pimentel

San Juan, Puerto Rico, a 10 de mayo de 1968

Disiento porque, a mi juicio, la prueba aducida no es suficiente para sostener la convicción y "no establece la culpabilidad del apelante más allá de duda razonable", como dijo el compañero Juez Asociado Señor Dávila en *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56, 60 (1966), con quien concurrieron los otros compañeros jueces que con él sostienen la sentencia en el caso que nos ocupa.

Se dice en la sentencia en este caso que en cuanto a la apreciación, credibilidad, peso y evaluación de la prueba de cargo, "No es nuestra función sustituir al jurado en ese menester."

En *Serrano*, supra, sin embargo, lo que hizo el juez ponente no fue otra cosa que justipreciar la prueba aducida y que el jurado consideró para llegar a una conclusión distinta y contraria a la que llegó el jurado, o sea, que la prueba en ese caso no estableció la culpabilidad más allá de duda razonable.

Un cuidadoso estudio de nuestra opinión en *Pueblo* v. *Ortiz Morales*, 86 D.P.R. 456, 468 (1962), revela que este Tribunal, por voz del Juez Asociado Señor Santana Becerra, dirimió un conflicto en la prueba en forma contraria a como lo hizo el jurado para luego aplicar ciertas normas de derecho expuestas en *Pueblo* v. *Pérez*, 79 D.P.R. 487 (1956).[1] En *Ortiz Morales*, supra, un jurado encontró al apelante culpable de homicidio involuntario bajo una acusación de manejar un vehículo de motor tan negligente y descuidadamente, a exceso de velocidad, sin tomar en cuenta las condi-

---

[1] Es obvio que en todo caso hay un marco de derecho dentro del cual se consideran y resuelven todos los conflictos de prueba. Los criterios de derecho relacionados en *Pérez*, supra, son al efecto de que el límite de velocidad a que debe conducirse un vehículo está determinado por varios factores además del límite de velocidad prescrito por ley.

ciones y ancho de la carretera, que arrolló a Luis Tomás Arce. En su opinión, el compañero Juez Señor Santana Becerra hizo un minucioso análisis del testimonio de cada testigo, justipreció la prueba al igual que lo hizo el jurado, y concluyó que "Analizando todos esos elementos de juicio que ofrece la prueba, ya en conjunto o ya únicamente la de cargo con la plena credibilidad que a ésta pudo darle el jurado, a la luz de la norma de derecho aplicable, no creemos que El Pueblo probara su caso, cuando menos, más allá de una duda fundada."

En *Pueblo* v. *Ramos*, 43 D.P.R. 71, 73 (1932), dijimos que: "Generalmente respetamos la conclusión o veredicto de un jurado declaratorio de la culpabilidad de un acusado particularmente en la credibilidad que da a los testigos, pero como tribunal de apelación podemos determinar si hubo un manifiesto error en la apreciación de la prueba o si ésta es de tal naturaleza que no justifica el veredicto y no es bastante para sostener una condena."

En *Pueblo* v. *Plata*, 38 D.P.R. 89 (1928), revocamos el veredicto de culpabilidad de un jurado, en un caso de hurto porque "La única prueba presentada en el juicio fue la del fiscal y su examen nos convence que el jurado cometió un manifiesto error al apreciarla y al llegar por ella a un veredicto de culpabilidad, pues nada hay en la misma que demuestre la culpabilidad del acusado Plata como autor o como cómplice del delito."

En *Pueblo* v. *Vázquez*, 33 D.P.R. 194 (1924), revocamos la sentencia condenatoria del delito de homicidio involuntario porque "La prueba no tendió a sostener la acusación como fue ampliada, es nuestra verdadera razón para la revocación."

En *Pueblo* v. *Rivera*, 25 D.P.R. 812 (1917), revocamos la convicción del delito de asesinato en primer grado porque "las circunstancias antes expuestas [un resumen del testimonio de cada testigo] sin nada más, no demuestran la de-

liberación y premeditación necesarias a sostener una convicción por el delito de asesinato en primer grado."

En *Pueblo* v. *Ortiz*, 22 D.P.R. 677 (1915), el apelante fue acusado del delito de falsificación consistente en pagar el precio de dos ejemplares de periódicos y unos pollos con moneda falsa. Al revocar el veredicto de culpabilidad del jurado dijimos que "Creemos que la prueba en conjunto, incluyendo ambas transacciones es enteramente insuficiente para sostener el veredicto."

En *Pueblo* v. *Cofresí*, 22 D.P.R. 749 (1915), revocamos un veredicto condenatorio del delito de conspiración para destruir bienes asegurados por medio de incendio. Dijimos que "a lo sumo sería una prueba muy insuficiente."

En *Pueblo* v. *Vega*, 15 D.P.R. 339, 352 (1909), revocamos una convicción de asesinato en primer grado porque, luego de analizar y justipreciar la prueba que consideró el jurado, concluimos que "En nuestra opinión, las circunstancias probadas en el juicio, no eran suficiente en sí, ni estaban suficientemente relacionadas las unas con las otras, para justificar un veredicto de culpabilidad . . . mientras no se pruebe su culpabilidad fuera de duda razonable, mediante pruebas adecuadas y suficientes, no puede ser castigado por ningún delito."

Véanse, además, *Pueblo* v. *Tirado*, 69 D.P.R. 389, 396 (1948); *Pueblo* v. *Ramírez*, 22 D.P.R. 471 (1915); *Pueblo* v. *Robles*, 13 D.P.R. 308, 316 (1907); *Pueblo* v. *González*, 13 D.P.R. 33 (1907).

De lo expuesto, es evidente que este Tribunal debe intervenir con el veredicto de un jurado cuando, luego de analizar y justipreciar la prueba que desfiló ante el jurado, concluye que la misma es insuficiente para sostener la convicción o no establece la culpabilidad más allá de duda razonable.

La cuestión ante nos en este caso se relaciona con la identificación del apelante como el autor del delito de robo del cual el jurado lo encontró culpable. Si la prueba de tal

identificación es vaga, dudosa, increíble o insuficiente en derecho no se ha probado la relación del apelante con el delito más allá de duda razonable. *People* v. *Cullota*, 207 N.E.2d 444 (Ill. 1965) ; *People* v. *Barney*, 208 N.E.2d 378 (Ill. 1965) ; *Commonwealth* v. *Miller*, 201 A.2d 256 (Penn. 1964) ; *People* v. *Bryan*, 188 N.E.2d 692 (Ill. 1963) ; *Phillips* v. *State of Texas*, 297 S.W.2d 135 (Texas 1957).

A la luz de lo expuesto con respecto a la regla de derecho aplicable, examinemos la prueba aducida en este caso en lo que se refiere a la identificación del autor del delito del cual el jurado encontró culpable al apelante. Dicha prueba fue la siguiente:

La dueña del bar-restorán en que se cometió el delito de robo en este caso no se encontraba en él cuando ocurrieron los hechos en la noche del 22 de septiembre de 1966. El empleado Ramón Rodríguez Miranda, quien atendía la barra del establecimiento en esa noche, estaba en la barra cuando llegaron tres individuos y le dijeron "No se mueva" y él se quedó donde estaba "y no pude mirarlos." Testificó que abrieron la caja y se llevaron $200; que el que abrió la caja era alto y grueso pero no pudo identificarlo por el rostro. Ningún detalle físico de la persona le llamó la atención. El que abrió la caja le apuntó al oído con un revólver de cañón largo y negro; que el otro pasó a la cocina; no lo vio bien; que para alcanzar la caja y abrirla el atracador se subió en la baranda que tiene la barra, que el otro empleado, Federico Ortiz Cruz, estaba en la cocina. Dijo que la luz en el establecimiento es simple.

Ortiz Cruz testificó que estaba trabajando en la cocina del establecimiento "cuando veo al señor Ramón Miranda encañonado con un revólver, así pegado al oído, un revólver negro, grande, de cañón largo. Yo me quedé mirando, cuando miro que estaba sacando el dinero de la caja estaba . . . con esta mano izquierda sacando el dinero a punta de uña, cuando le da para atrás a la caja así mismo se fue dando para

atrás, lentamente. Cuando voy en defensa de Ramón Miranda, el otro me cogió y me dijo: 'No te muevas porque te pego un tiro', yo no encontraba qué hacerme, yo me encontraba con un cuchillo haciendo unos entremeses y tuve que tirarlo para atrás." Señaló al apelante presente en el tribunal como el que encañonó a Rodríguez; que tenía un revólver de cañón largo, negro; que el otro lo encañonó a él, Ortiz, con revólver de cañón corto, negro. Su testimonio continúa, en partes, así:

"P ¿Y cómo fue que usted dice que abrió la caja?

R A punta de uña. Una uña larga que tenía pude verla también y también como estoy como a esta distancia, de la cocina de aquí a la registradora.

P ¿Usted vio, si fue que lo vio, que sustrajera alguna propiedad, el allí acusado, de esa caja?

R Bueno, él sacó de esa caja los $200 dólares que había en billetes.

.    .    .    .    .    .    .    .

P Cierto. ¿Usted vio a la persona que sustrajo el dinero de la caja?

R Sí.

P ¿Quién fue esa persona?

R Aquel señor.

P Señala al acusado. Para efectos del récord.

.    .    .    .    .    .    .    .

P ¿Le ofrecieron ustedes alguna resistencia a estas personas que vinieron a encañonarlos con el revólver?

R Cuando encañonaron a Moncho que yo iba a ir para donde el señor Ramón fue que el otro me encañonó en la cocina, que yo estaba haciendo unos entremeses. Como a los tres minutos salieron y se fueron.

.    .    .    .    .    .    .    .

P Siéntese. Bien señor, descríbame usted con lujo de detalles lo que usted vio aquella noche, al señor ese que encañonaba a Monchito.

R Sí, señor.

P Descríbame cómo vestía, cómo era.

R Tenía camisa gris.

P Siga.

R Tenía un antifaz que le bajaba hasta por aquí y tenía esto por fuera.

P Antifaz, ¿Cómo era ese antifaz?

R Le caía aquí pero tenía esto aquí descubierto.

P Déjeme ver si el pañuelo mío está limpio.

R El pañuelo suyo no es antifaz.

P Ah, sí.

R No era puesto así y roto.

P ¿Tiene un pañuelo por ahí usted? ¿Pues mire a ver si puede hacer con las manos como era eso?

R Tenía eso pero lo tenía todo por fuera.

HON. JUEZ: Para el récord, se pone las manos alrededor de los ojos.

R Por lo menos así y esto tapado aquí.

HON. JUEZ: Ahora se hace hacia atrás, hacia la nuca.

LCDO. TORRES: Se pone las manos como desde la mandíbula, o sea, desde la barbilla hasta la sien y dice que era hacia atrás, o sea, que cubría nariz, boca, parte de la barbilla y parte del frente.

R Así hacia atrás.

P ¿Cómo era el antifaz que él tenía puesto y desde dónde?

R Lo tenía puesto de aquí para atrás, así.

P ¿Dónde empezaba?

R Eso empezaba aquí y le caía aquí, así.

P ¿Así, cubierto hasta acá?

R Sí.

P ¿Y entonces caía hasta por aquí abajo?

R Sí, pero tenía unos boquetes aquí abajo.

P ¿Así hasta abajo y le veía los dos boquetitos?

R Se le veía completo.

P ¿Tenía uno para respirar?

R Sí.

HON. JUEZ: Señala él la región alrededor del ojo cuando dice que se le veía todo esto.

P ¿Tenía la nariz cubierta y todo?

R Tenía la nariz y ojos y todos, según le digo.

P ¿Ese antifaz de qué color era?

R Negro.

P ¿Qué más usted observó en esa persona?

R Esa persona, que la conozco por el pelo que lo tenía estirado.

P Dígame todos los detalles que usted miró en esa persona y que usted recuerde.

R Por el alto y por el físico cuando lo fuí a indentificar [sic].

P Olvídese cuando lo fue a identificar, yo quiero lo que vio aquella noche.

R Vi aquella noche el mismo que identifiqué.

P Quiero saber lo que usted vio aquella noche, indique de esa persona lo que usted vio.

R Que le vi el revólver.

P ¿Tenía un antifaz?

R Tenía un revólver.

P ¿Un revólver?

R Y le vi el antifaz que le bajaba.

HON. JUEZ: Cuando dice que el antifaz le bajaba se señala el pecho.

P ¿El antifaz le bajaba hasta dónde?

R Aquí, sí, señor.

HON. JUEZ: Se señala la cintura.

R Estoy señalando aquí.

P A ver si está el récord claro. ¿Un antifaz desde la frente con dos hoyos que se le veían los ojos, la nariz, que le cubría la cara y bajaba hasta dónde?

R Hasta aquí.

P Diríamos la cintura.

.        .        .        .        .        .        .        .

P Como se levanta mucho. ¿Entonces usted dice que el señor éste que estaba apuntándole a Moncho tenía una camisa gris y un antifaz que le cubría la cara desde la frente hasta la cintura, verdad? ¿Eso fue lo único que usted observó en esa persona?

R Sí.

.        .        .        .        .        .        .        .

P ¿Dígame si observó el color de los ojos?

R Vi las cejas completas.

P ¿El color de los ojos eran verdes, azules, grises, de esos que cambian de colores, amarillos, brown, negros?

R Bueno, yo no podía identificarle los ojos a él porque yo lo que vi fue esto nada más.

P ¿Yo le pregunto que si sabe el color de los ojos?

R No, señor, no sé.

P Dígame si usted le observó la forma de la boca y de la nariz?

R Bueno, según le dije, lo único que le vi, no le vi nada más.

P ¿Le observó la forma de la nariz, que si tiene una nariz larga, que si tiene una nariz corta, que si tiene una nariz achatada, si cómo.

R Eso . . . yo lo único que yo me fijé según la identifiqué, esa noche a la nariz yo no le cogí forma; no.

P ¿No recuerda la forma de la boca, si una boca pequeña, ancha, labios angostos o grueso; tampoco?

R Yo lo único que lo vi a él nada más vuelvo y le digo.

HON. JUEZ: No puede, adelante.

P Tampoco, boca tampoco, ¿y si el pelo era lacio, si era enroscado, si era rubio?

R El pelo lo tenía estirado.

P ¿Hasta dónde le llegaba el pelo?

R Bueno, el pelo lo tenía estirado, se había dado como un peinado.

.    .    .    .    .    .    .    .

P ¿Dígame, señor, yo le preguntaba que si recordaba la boca de este señor que se presentó el 22 de septiembre de 1962, que usted dice que se llevó el dinero?

R Yo la boca no la pude ver porque según le dije lo único que pudo verle fue la nariz.

P ¿La barbilla cómo era?

R Tampoco la vi.

P ¿Los pómulos?

R Le vi esto nada más.

P ¿Los pómulos tampoco los vio?

R No, señor.

P ¿Las orejas?

R Esto aquí nada más.

P ¿Tampoco?

R Nada más.

P Tampoco. ¿El pelo usted dice que lo tenía estirado?

R Sí, señor; estirado.

P ¿Peinado con mucha grasa?

R Un peinado estirado.

P ¿Como cuando se pone mucha grasa uno?

R Sí.

P ¿Dígame si alguna señal personal que tenga esa persona que usted recuerde?

R Bueno, como la única lo que le vi fue esa nada más.

Hon. Juez: ¿Qué contestó?

R Que como señal yo le había visto nada más que la señal . . .

P ¿Del antifaz?

R Del antifaz.

P ¿O sea, usted no puede recordar esa persona porque tenía un antifaz puesto?

R Lo reconozco por esto.

P ¿Por qué por esto?

R Por las cejas.

P ¿Cómo eran las cejas?

R Abultadas.

P No lo mire a él ahora.

R Abultadas, según las vi.

P ¿Las cejas suyas son abultadas o cómo?

R Las mías, sí un poco.

P Las cejas abultadas las tienen muchas personas, las tienen, por ejemplo, el Sr. Secretario, el Sr. Fiscal, yo no porque yo no tengo casi cejas. ¿Dígame si tenía bigote o no?

R El bigote no se lo vi.

P ¿Entonces usted lo que ve son dos ojos por unos rotitos?

R Rotitos no, bastante grandes.

P ¿Cómo de grandes?

R Según le dije.

P Dibújemelos allí.

R Según le dije, yo no sé dibujar.

P Ayer no me dibujó allí el bar del Proville. Ahora, dígame, ya que usted se empeña en que las cejas eran abultadas, ¿de dónde a dónde se extendían esas cejas, se extendían bien hacia atrás o si era hasta la mitad?

R Unas cejas así.

P Para el récord, se lleva las manos hasta lo que se le llama la sien, o sea, hasta el final de los ojos, bien hacia atrás como una pulgada.

R Umjú.

P ¿Dígame, es o no cierto, que cuando usted salía de la cocina usted fue encañonado y usted se echó así para atrás?

R Con el permiso.

P ¿Que si fue así, sí o no?

HON. JUEZ: Déjelo que explique.

R Yo tengo que explicar.

P La pregunta es que si echó para atrás.

R Sí, señor; en ese momento me eché para atrás.

P ¿Hasta dónde retrocedió usted hacia atrás en la cocina?

R Como de aquí a la mesa.

P ¿Esa del medio?

HON. JUEZ: Como doce pies.

P ¿Entonces cuando usted sale a la puerta enseguida que lo encañonan usted retrocede como doce pies?

R Seguro.

P ¿Y se queda allí?

R Me tuve que quedar así mismo.

P ¿Hasta qué tiempo o hasta cuándo se quedó usted a doce pies dentro de la cocina con las manos en alto?

R De tres a cinco minutos.

P ¿Y esa situación cuánto tardó, el total, desde que llegan estas personas allí, dos personas con dos antifaces, como usted dice que eran dos, y lo atracan?

R Bueno, cuando . . .

P ¿Cuánto tiempo tardó eso?

R De tres a cinco minutos.

P ¿Entonces el atraco que usted habla, el alegado atraco ese dura de tres a cinco minutos y usted está en la cocina de tres a cinco minutos con las manos en alto?

.    .    .    .    .    .    .    .

P ¿Dígame si esa cocina tiene una puerta o no?

R Tiene una puerta así.

P ¿Que se cierra?

R Así.

P ¿Y el que entró donde usted a la cocina cerró la puerta para que nadie se diera cuenta?

R Se quedó así de lado.

P Perdone, ¿Así de lado?

R De lado aquí sobre la puerta, de lado.

P  ¿O sea, que él cubría parte de la puerta?

R  El cubría casi toda la puerta, de lado así.

P  ¿Pero de qué modo?

R  De frente para donde mí.

P  ¿De frente para donde usted?

R  De frente para donde mí.

P  ¿Usted lo miraba a él nada más?

R  Estaba mirándolos a los dos.

P.  ¿Estaba mirándolos a los dos?

R  Seguro que sí.

P  Era obscura. ¿Dígame usted cómo fue que esta persona trigueña que usted le veía solamente los ojos y el pelo estirado, cómo fue que hizo la operación esa para sacar el dinero?

R  Bueno, cuando yo me fijé, que estoy en la cocina, miro para la barra tienen al señor Ramón con el revólver pegado aquí al oído, con esta mano hala la caja a punta de uña, uña larga.

P  ¿Qué es eso de uña larga?

R  Uña así de larga.

P  Para el récord como una pulgada y pico. ¿Todas las uñas?

R  La uña con que sacó el dinero de la caja, cuando sacó el dinero de la caja tenía la uña larga, cuando haló el mango de la caja a punta de uña y cogió los $200 dólares.

HON. JUEZ: Hace un movimiento con los dedos de la mano izquierda.

P  ¿Usted vio la mano completamente, sí?

R  Seguro.

P  ¿Todas las uñas eran largas?

R  Todas, todas; así por el mango de la caja.

.        .        .        .        .        .        .        .

P  ¿Diga si las manos eran blancas o trigueñas?

R  Medias trigueñas.

P  ¿Dígame si ese color de ese señor es medio trigueño?

R  Medio trigueño.

P  ¿Dígame si ese señor tiene el pelo estirado?

R  Ahora no, pero primero sí.

P  Venga acá, párese.

R  Ahora no porque ahora está recortado, primero no.

P  Baje la cabeza.

HON. JUEZ: No podemos hablar al mismo tiempo.

P  Mire a ver si es posible.

HON. JUEZ: Un momentito, mostrándole al jurado la cabeza del acusado. Lo ha colocado frente al testigo. Vamos a ver, adelante.

P ¿Usted dice, señor, que la persona que usted vio aquella noche la reconocía por el pelo y por los dos ojos que veía a través de un antifaz que tenía desde la frente hasta la cintura?

R Que le caía aquí.

P ¿Dígame si este señor, si es posible que este señor se haya recortado, que le crezca . . .

R Ahora está recortado, tenía el pelo estirado ahora no.

P ¿Estaba grasoso? Ustedes van a hacer una determinación si es posible que este señor pueda tener el pelo tan largo como para estirárselo. .

P Dígame si vio la masa del revólver, donde van las balas?

R Sí.

P ¿De qué color era esa masa?

R Negra.

P ¿Dígame si tenía balas o no?

R Balas; tenía.

P ¿Las vio también?

R Del que estaba en la cocina.

P ¿Usted a doce pies de distancia ve unas balas de una masa negra?

R No estoy a doce pies estoy a esta distancia.

HON. JUEZ: Marca aproximadamente tres pies y medio.

.     .     .     .     .     .     .     .

P ¿Y la persona que le apuntaba a usted también interfería con la visibilidad?

R Bueno sí, ese fue el que me cogió a mi porque yo no pude salir en defensa del otro.

P ¿Y ese mismo también fue el que lo metió doce pies atrás?

R Sí, señor.

P ¿Sin embargo, usted vio todo?

R Yo eso lo veo de momento.

P ¿El cañón largo, las balas que estaban de lado . . .?

R Yo tengo veinte-veinte de vista.

P ¿Dígame cómo era esa luz que había en la caja?

R Bueno, la luz se veía, por eso le digo.

P ¿Cómo es la luz, si era una luz blanca, roja, amarilla, verde?

R  No, era una luz como colorada.

P  Una luz colorada.

R  Sí, la que estaba encima de la caja, una bombilla grande.

P  ¿Esa era la única luz que había en la caja?

R  Las otras son pequeñas.

P  ¿Las demás luces del negocio en qué colores son?

R  Distintos colores.

P  Diga los colores.

R  Sí, le voy a decir los colores.

P  Eso es lo que le pido.

R  Verde, amarillas, coloradas, rojas . . .

P  Siga.

R  . . . azules, verdes.

P  ¿Dentro no hay ninguna bombilla blanca?

R  Afuera hay blanca.

.     .     .     .     .     .     .     .

P  Bueno, señor, en fin ¿dígame porqué es que usted dice que reconoció esa persona?

R  Vuelvo y le digo, por esto.

P  ¿Por los ojos?

R  Sí. La reconocí porque el día 11 de octubre fue la detective . . . .

.     .     .     .     .     .     .     .

R  Señor Juez, yo quería decir que después que ese señor, nos asaltaron a nosotros, el 11 de octubre fue la detective, dos detectives, mostrándonos el retrato de él, siendo el mismo individuo que yo reconocí esa noche, siendo el mismo individuo. Eso sería todo lo que quería informar; el 11 en el Cuartel General.''

La defensa le presentó al testigo una licencia de conductor y le pidió que identificase en la Sala la persona cuya fotografía aparecía en dicha licencia. El récord sobre este incidente es el siguiente:

"P  ¿Mire a ver si está en el Tribunal esta persona que le mostré en este retrato?

R  No sé decirle, yo no veo bien eso ahí.

.     .     .     .     .     .     .     .

P  ¿Cuántas fotografías le mostraron?

R  Como tres o cuatro.

P  ¿En total?

R  Como tres o cuatro.

P  ¿Le dijeron este señor?

R  El mismo.

P  ¿Le dijeron este señor?

R  Yo le dije que era aquél porque yo lo vi la noche del 22. Yo le dije: 'este señor mismo es'. Por eso fue que lo identifiqué.

P  Como vio la Identificación 1 de la defensa y no pudo identificarla.

R  Yo lo vi en otro retrato, ese retrato está obscuro y yo no lo veo.

P  Míreme a mí ahora.

R  Yo no veo bien ese retrato.

P  No lo ve; ¿o sea, que usted en realidad no ve bien? Señor, dígame si usted no fue operado de la vista en una ocasión?

R  Todavía no.

P  ¿Cuándo se va a operar?

R  Se llegará el día porque estoy medio ciego de este ojo.

P  ¿Está medio ciego del ojo derecho?

R  Sí."

El cocinero Ortiz identificó al apelante como el que abrió la caja registradora y sacó de ella los $200 que habían en billetes. A mi juicio, esta identificación es tan irreal e increíble que en efecto no se trata del grado o extensión de la identificación sino de que ésta no pudo hacerse y por lo tanto no hubo tal identificación, pues el cocinero:

(1) estaba medio ciego de un ojo tanto que no pudo identificar al abogado defensor al mostrarle éste su retrato en su licencia de conducir; testificó que estaba obscuro.

(2) la luz en el lugar del asalto era tenue cuando se cometió el delito.

(3) el cocinero estaba en la cocina retrocediendo hacia el fondo, como a doce pies de la caja.

(4) tenía de frente a uno de los asaltadores que le apuntaba con un revólver y lo hacía retroceder.

(5) veía hacia la caja por el hombro del que le apuntaba y quien cubría casi todo el espacio de la puerta entreabierta entre la cocina y la barra.

(6) el que abrió la caja usaba un antifaz que le cubría todas las facciones.

(7) sólo le vio el pelo estirado y las cejas pero en el juicio el apelante tenía el pelo corto. Testificó que lo reconoció por las cejas abultadas, circunstancia común en muchas personas.

(8) es por demás increíble que pudiera ver, en esas condiciones, desde la cocina, el acto de sacar el asaltante los $200 en billetes de la caja.

Asumo que el jurado trajo un veredicto de culpabilidad debido a que tuvo la misma preocupación que indudablemente tuvo la mayoría del Tribunal al dictar su sentencia en este caso de que "basta que un asaltador use un antifaz para que haya obtenido su inmunidad." Pero es que de existir tal preocupación la misma no responde a la realidad. Este caso presenta una serie de circunstancias excepcionales, que difícilmente se dupliquen al extremo de hacer imposible una identificación en otros casos.

La identificación es un elemento esencial en este proceso. La culpabilidad o inocencia del apelante depende exclusivamente de su identificación. Cabe la posibilidad de que se condene a un inocente con respecto a quien existe duda razonable de su culpabilidad. Hay que recordar que la identificación a base de fotografías o de un alineamiento de personas no es concluyente pues, colocado en esas circunstancias, la tendencia del testigo es a identificar a alguien. Lo que quiere decir que la identificación, en ocasiones, hay que considerarla con sospecha y no como concluyente. *United States* v. *Wade*, 388 U.S. 218, 228 (1967). Bajo las circunstancias de este caso, la identificación es el producto de la imaginación del testigo cocinero animado del deseo muy corriente y encomiable de descubrir al autor del delito.

Por lo tanto, concluyo que hemos debido revocar la sentencia en este caso.