EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS AVILÉS RODRÍGUEZ, demandado y apelante.

*Número:* CR-66-298     *Resuelto:* 21 de septiembre de 1967

*M. Martínez Umpierre,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* e *Irene Curbelo, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

El Art. 203 del Código Penal de Puerto Rico considera homicidio involuntario la muerte ilegal a un humano, sin que medie malicia, ocurrida al realizarse un acto ilegal que no constituye delito grave o al realizarse un acto legal que pudiere ocasionar muerte en forma ilegal, o sin la debida prudencia o circunspección. Por otro lado, la Sec. 5-101 de la Ley Núm. 141 de 20 de julio de 1960, considera ilegal conducir un vehículo en la zona rural a una velocidad mayor de cuarenta y cinco millas por hora y ordena que la velocidad se regule teniendo en cuenta el ancho, tránsito, uso y condiciones del camino y exige que nadie guíe a una velocidad mayor a la que permita ejercitar el debido dominio del vehículo y la reducción de la velocidad que sea necesaria para evitar un accidente o detener completamente el vehículo. Este caso ocurre en el kilómetro 88.5 de la carretera Núm. 2 de Puerto Rico, conocida por la carretera militar,

una vía ancha y llana entre los pueblos de Camuy y Hatillo, zona de poco tránsito durante las horas de la noche, usada generalmente para un tráfico de automóviles y tractores bastante moderado, fuera del área de congestión que produce la proximidad de la capital de Puerto Rico hecho este último del cual tomamos conocimiento judicial.

La prueba demuestra que en el momento que ocurre el desgraciado accidente, el tráfico era poco, la carretera estaba seca, no había vehículos transitando en dirección contraria, ni luces cegando la visibilidad. Los dos únicos indicios de posible falta de prudencia o circunspección que se insinúan en la prueba de inculpación son los siguientes: (1) el exceso de velocidad y (2) no haber tomado en consideración que en la misma dirección en que venía el vehículo, caminaban dos hermanos, uno más joven que el otro, cerca del borde de la carretera, pero dentro del paseo derecho que tiene la carretera para el tránsito de peatones.

Las tres personas envueltas en la prueba de inculpación son los hermanos Juan Crespo Vargas, Félix Crespo Vargas y Rafael Crespo Vargas. Al llegar junto al puente que divide a Camuy y Hatillo, se les queda el automóvil sin gasolina, y entonces Juan Crespo Vargas envió a sus otros dos hermanos Félix y Rafael a buscar gasolina; que ellos salieron a buscar gasolina como a las ocho y minutos y un poco más tarde, como a las ocho y diez, pasó un carro Chevrolet modelo del 1955, color azul oscuro que venía como de Camuy para Hatillo, o sea, en la misma dirección que caminaban los hermanos que salieron a buscar gasolina; que dicho automóvil venía a una velocidad como de setenta millas por hora. El hermano superviviente de los dos que salieron a buscar gasolina, Félix Crespo Vargas, declaró que no observó la velocidad a que caminaba el Chevrolet porque él iba de espaldas al carro.

Por el contrario, el acusado Sr. Luis Avilés Rodríguez, declara que venía de 30 a 35 millas, que venía con su señora

y tres hijos dormidos en el asiento de atrás del automóvil y la hija señorita y un hijo pequeño despiertos en el asiento delantero. Se trató de establecer en la prueba de inculpación que el acusado había seguido sin detenerse, pero el acusado declara que él se paró y sólo vio uno de los dos, que parecía muerto, extremo que es corroborado por el testigo Juan A. Estrella, Teniente de Policía de Hatillo, quien declaró, que estando él en Hatillo "llegó el señor Avilés lo más apurado; [le dijo] que había tenido un accidente en la carretera . . . que más acá del puente de Camuy el automóvil que guiaba había arrollado a dos personas, y que creía que una estaba muerta." Sigue declarando el Teniente que el automóvil del acusado tenía una abolladura en la parte delantera, al lado derecho "pero sobre el bonete y no sobre los guardalodos". Al llegar el Teniente Estrella al sitio donde ocurrió el accidente se encontró con el mismo cuadro que le había descrito el acusado, un hermano muerto y otro golpeado. El acusado declara que al detenerse no vio al segundo hermano.

La conjetura que el acusado había seguido de largo, sin pararse, se hace ante el hecho que no había huellas de frenada junto al sitio del accidente. El acusado explica que no dejó huellas de frenada porque él venía despacio, llevaba el pie encima del freno "pero fue tan rápido que pisé el freno y quedé parado". Que se detuvo un momento porque vio un solo hombre, un hombre muerto y como los nenes suyos estaban en el carro dormidos, decidió ir al Cuartel. El Teniente Estrella corrobora que cuando llegó al cuartel el acusado le dijo que tenía a su familia en el carro. El hermano sobreviviente Félix declaró, que cuando vino el carro y les dio el cantazo, "a él primero [a Rafael, el occiso] y después con el cuerpo de él me dio a mí. Me tiró al paseo y él quedó botado como a treinta pies de distancia . . . [y el testigo quedó] medio achocado . . ." que arrastrándose fue hacia su hermano porque no podía andar, tenía heridas "por las piernas y por aquí, el cerebro".

En cuanto a la forma como se produce el accidente, el hermano sobreviviente Félix Crespo Vargas, declara: que cuando ocurre el choque del automóvil con el cuerpo de su hermano Rafael, no veían el automóvil que venía porque había una curvita, que caminando por la derecha, de oeste a este (de Quebradillas para Hatillo), "el hermano mío [Rafael, el occiso] venía al lado izquierdo mío, por la orilla" más cerca de la carretera que el testigo; que el testigo lo mandó a cambiar a la derecha, que cuando su hermano Rafael se cambió, "entonces viene el carro y nos dio un cantazo .... Si a él [a Rafael] primero y después con el cuerpo de él me dio a mí, me tiró al paseo y él quedó botado como a treinta pies de distancia." Contrainterrogado por el abogado de la defensa sobre la razón por la cual el testigo Félix le mandó al occiso Rafael a cambiar de sitio, contesta:

"P. Usted dijo que le había dicho a su hermano que se cambiara.

R. Sí.

P. ¿Por qué se lo dijo? ¿Cuál fue la razón?

R. Porque el venía por este lado y para qué no fuera a sufrir un accidente yo lo mandé a cambiarse acá.

P. Tenía usted temor entonces de que él fuera a sufrir algún accidente.

R. Sí, señor.

P. ¿De dónde venían ustedes?

R. De Quebradillas. De unas bodas de la prima mía.

P. ¿A qué hora empezó la boda en qué estaban todos sus familiares?

R. Cómo a las cuatro y media.

Abogado: Y eran las ocho cuando ocurrió eso. ¿Se dieron unos palitos en la boda?

R. Nostros no. Yo no puedo beber.

P. ¿Pero habían bebido los otros allí en la boda?

R. Sí.

P. ¿Habían bebido?

R. Sí.

Abogado: Eso es todo, Su Señoría."

El testigo de la defensa Agripino Rodríguez, quién por tenerse que ausentar de Puerto Rico dejó una deposición, declaró, que el 2 de mayo de 1964, al pasar por el kilómetro 88.5 de la Carretera número 2, como a las ocho de la noche vio dos muchachos que se cogían de brazos empujándose uno al otro por la carretera, venían por el pavimento de la carretera, "a brazo echado uno a otro"; que a él le llamó la atención el hecho porque "uno manejando piensa que algo podía ocurrir"; que los muchachos venían a mano izquierda del testigo porque venían como de Aguadilla hacia Arecibo; que él siguió adelante porque tenía su derecha limpia y el testigo iba en dirección a Aguadilla; que siguió para su casa y cuando ya estaba en su casa, en el balcón, como a los quince o veinte minutos pasó una gente por la carretera diciendo que habían matado un muchacho después del puente de Camuy; que el testigo se montó en su *truck* y fue a ver el accidente y vio al muerto, el mismo que había visto como cinco minutos antes de ocurrir el accidente cuando iba de brazos con el otro, empujándose uno al otro por la carretera; que cuando los vio echado de brazos le llamaron la atención porque estaban en una forma peligrosa "porque iban como en brincos por la calle, empujándose."

El acusado declaró que había visto a esas dos personas, que venían por encima del pavimento de la carretera; que cuando los vio les tocó claxón y puso el pie en el freno, y se tiró hacia la raya blanca; que cuando tenía puesto el pie sobre el freno, el que iba a la parte de afuera empujó al otro al medio de la carretera; que "ahí"—en este instante— pisó el freno pero ya era tarde; le tiró el carro encima, de momento, no podía hacer otra cosa, cuando el que iba en la parte de afuera (Rafael, el occiso) empujó al otro (Félix, el testigo); que "cuando lo empujó se arreguindaron; primero lo empujó y después lo aguantó. Pero era muy tarde ya"; que el que empujaron le echó mano al otro y parece

que el de afuera lo agarró; que hace diecinueve años que ha estado manejando *trailers* y nunca ha tenido un accidente.

Este es un caso desgraciado en que no puede decirse con razonable serenidad de conciencia que el acusado actuara sin la prudencia o circunspección que el estatuto dispone. Prudencia y circunspección no son sinónimos de predicción o infalibilidad. Es contrario a la experiencia corriente de la previsión paterna que un conductor de vehículos con tres hijos dormidos en el asiento de atrás y dos hijos más y su esposa en el asiento del frente se ponga a conducir, de noche, un automóvil a setenta millas por hora. Hay una serie de indicios claros, de que tanto el hermano mayor que lo acompañaba, como el conductor del *truck* de caña que pasa junto a los dos hermanos, se dan cuenta que puede ocurrirle un accidente al hermano menor, porque los hermanos cogidos del brazo se están dedicando a un retozo que puede resultar peligroso. Las leyes físicas que rigen el movimiento de los cuerpos al caer suelen dibujar los más torturantes dibujos cabalísticos en el telar de la adversidad. Por eso no resultan confiables a la conciencia del juzgador. Siguiendo el método analítico, anteriormente empleado en el caso de *Pueblo* v. *Pérez*, 79 D.P.R. 487 (1956), cita precisa a las págs. 493–495 y *Pueblo* v. *Ortiz Morales*, 86 D.P.R. 456, (Santana Becerra) (1962), cita precisa a las págs. 467–468, concluimos que *debe revocarse la sentencia dictada por la Sala de Arecibo del Tribunal Superior de Puerto Rico, con fecha 2 de octubre de 1964, en la causa criminal M64-157 de dicha Sala.*

El Juez Presidente Señor Negrón Fernández no intervino. Los Jueces Asociados Señores Pérez Pimentel y Blanco Lugo disintieron. El Juez Asociado Señor Rigau no intervino.