EL PUEBLO DE PUERTO RICO, apelado, *v.* LUIS A. TORRES RODRÍGUEZ, acusado y apelante.

*Número:* CR-86-27     *Resuelto:* 25 de noviembre de 1987

*Pedro J. Rodríguez Santiago*, abogado del apelante; *Rafael Ortiz Carrión, Procurador General, Alberto Oscar Couret Torres, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

El Ministerio Público presentó acusación contra Luis A. Torres Rodríguez por el delito de asesinato en primer grado, cometido, según el pliego acusatorio, de la manera siguiente: "dio muerte al ser humano Elizabeth Acosta Roche, infiriéndole heridas punzantes en el cuerpo, las cuales fueron la causa directa de la muerte de ésta." Celebrado el juicio en el Tribunal Superior, Sala de Ponce, el jurado rindió veredicto de culpabilidad por los delitos de asesinato en segundo grado e infracción al Art. 4 de la Ley de Armas, 33 L.P.R.A. sec. 414. El tribunal denegó la moción de nuevo juicio presentada por el convicto y procedió a dictar la sentencia correspondiente. Posteriormente se le señaló una fianza en apelación. En apoyo de su recurso, la represen-

tación legal del apelante señala la comisión de los siguientes errores.

1. Erró el Tribunal al aceptar el veredicto del jurádo y declarar convicto al acusado ya que la prueba en conjunto era insuficiente para derrotar la presunción de inocencia y probar los elementos del delito fuera de duda razonable.

2. Cometió gravísimo error de derecho el Honorable Tribunal al no transmitir al panel de jurado unas instrucciones claras, precisas, consistentes ni lógicas y al no ofrecerles instrucciones solicitadas oportunamente de Homicidio; Homicidio Involuntario; Defensa propia; Diferencia entre asesinato y homicidio.

3. Cometió grave error de derecho el Honorable Tribunal al impartir instrucciones de hu[i]da sin que hubiera base en la prueba.

4. El efecto acumulativo de los errores precedentemente señalados al considerarse en conjunto tienen como efecto el privar al imputado de su derecho constitucional a un juicio justo e imparcial y de conformidad con el debido proceso de ley. Alegato del Apelante, págs. 16–17.

La naturaleza de los errores señalados hace imperativo resumir la prueba desfilada en el juicio, la cual fue elevada ante nos, vía exposición narrativa de la prueba, preparada por el apelante y aprobada por el tribunal.

La testigo Irma Roche declaró que era la madre de Elizabeth Acosta Roche, la cual tenía 21 años para el 21 de noviembre de 1984 y estaba casada con el acusado hacía seis años. A la fecha de los hechos, el matrimonio tenía tres hijos. El miércoles de esa semana Elizabeth llegó a la casa de su madre con el ojo hinchado y la parte izquierda del cuello en "cantos como negro". El acusado fue a su casa el jueves y el viernes. Su hija se quedó con ella hasta el sábado 24 de noviembre. Ese día por la tarde fueron de compras a Juana Díaz. Al encontrarse con Nilo, un amigo de la familia, Elizabeth le pidió que la llevara a casa de su esposo en Santa Isabel a buscar ropa y otras cosas. En el carro de Nilo iban

la testigo, su hija y un hijo de ésta de dos años. Al llegar, Elizabeth subió sola mientras los otros la esperaban. A los cinco o seis minutos salió el acusado al balcón y les dijo "v[á]yanse que yo la llevo después". No vio ni oyó a su hija en ese momento. Al llegar a su casa, media hora después, fueron a buscarla porque la llamaban por teléfono público. Volvió a Santa Isabel donde identificó el cadáver de su hija. En la repregunta explicó que su hija fue a buscar ropa para ir a una boda esa noche. Declaró que Nilo nunca se bajó del automóvil mientras esperaban a Elizabeth. E.N.P., págs. 1–6.

Saturnino Colón De Jesús (Nilo) era agricultor. Conocía a Irma Roche y su hija desde hace cinco años. Se encontró con ellas en la Tienda Cintrón de Juana Díaz. Elizabeth le preguntó si tenía prisa, pues quería que la llevara a buscar prendas y ropa. Él sabía que Elizabeth era casada aunque no conocía a su esposo. Le dijo que si no había problemas, él las llevaba. Al ella contestar que no había problemas accedió a llevarlas. El viaje tomó cerca de quince minutos. Al llegar, Elizabeth les dijo que la esperaran. Su madre le pidió que avanzara. Luego salió una persona que le dijo: "V[á]yanse que yo la llevo después." No sabe quién dijo eso. Durante el viaje de regreso doña Irma le comentó que el acusado no iba a dejar que su hija fuese a la boda. Luego de la llamada acompañó a doña Irma al Hospital de Santa Isabel. E.N.P., págs. 6–7.

El policía estatal Edwin García Vázquez, recibió una llamada como a las 2:30 P.M., de que había una persona herida. Al llegar al apartamento del acusado, se encontró con una hermana de éste llamada Evelyn. Ella le informó que el que tenía el problema era su hermano Luis, a quien el testigo ya conocía. Citamos de la Exposición Narrativa de la Prueba la parte pertinente de este testimonio:

Cuando entré al cuarto, o sea, frente a la puerta nos saludamos, le dije: "hola Luis["], me dice,: "hola Garc[í]a". "Le dije ¿qu[é] te pasó?", y me dice: "problemas con mi mujer. Estoy leyendo la Biblia cuando llega ella acompañada de otro hombre. Éste armado de un revólver, y a la vez me dice, la bofetá que le diste a tu mujer y a Humber la vas a pagar." A preguntas del fiscal de qui[é]n había dicho lo anterior dice que fue el señor Luis Torres que es el acusado en este caso. A la pregunta de qui[é]n acompañaba a la señora, manifestó que era un hombre y éste llevaba un revólver en la mano con el cual apuntaba a Luis y le dec[í]a, "la bofetá que le diste a tu mujer y a Humber la vas a pagar"[.] A la pregunta que qui[é]n había dicho, "la bofet[á] que le diste a tu mujer y a Humber la vas a pagar", dice que Luis le manifestó a él que fu[e] el señor que acompañaba a la occisa e iban dirigidas a Luis[.] Continuó el testimonio declarando que Luis se levantó de la cama y cog[ió] un cuchillo que ha[bía] en una pequeña mesa que [estaba] al lado derecho de la cama y salió a defenderse del hombre del revólver. Cuando se disponía a defenderse, que aquél empujó a la occisa sobre él y ahí es donde se le espeta el cuchillo. A la pregunta de quién empujó a la occisa y contra qui[é]n, manifestó que fu[e] el hombre que acompañaba a la occisa y la empujó sobre Luis y que ahí fue que se le espetó el cuchillo.

Atestó el testigo que ante la situación decidió llev[á]rselo para el cuartel como medida de seguridad y para hacerle las advertencias. Me entregó unas anotaciones que él llevaba desde el miércoles para acá, que sacó de una pequeña gaveta. Le pregunté por el cuchillo y me dijo que con el nerviosismo lo había tirado sobre el sofá. El lo buscó pero no lo encontró.

A la pregunta de d[ó]nde había tomado el cuchillo[,] manifestó el testigo que [é]l, Luis, le había dicho que lo había tomado de la cocina minutos antes y lo había utilizado para mondar una china y com[é]rsela. A la pregunta de si le describió el arma le dijo: "un cuchillo de cocina."

Preguntado el testigo de [a] qu[é] hora más o menos había llegado al apartamento de Luis[,] manifestó que 10 [ó] 15 minutos después de los hechos. A la pregunta de si había visto cáscaras, pepitas o "chupón" de china manifestó que no. Atestó que cuando llegó al apartamento llegó a la sala, a la derecha está la cocina y frente a ésta se encuentra el dormitorio. Al

llegar al cuarto la occisa no se encontraba allí. S[ó]lo estaba Luis y Evelyn su hermana. Evelyn fue la que me abrió la puerta de la sala. Luis estaba en el cuarto cambi[á]ndose de ropa. Tenía en esos momentos unos pantalones cortos y una "T-Shirt" y se estaba cambiando por un pantalón largo.

Preguntado por el Fiscal si vio la [B]iblia y si estaba abierta[,] manifestó que la [B]iblia estaba en la cama abierta. La [B]iblia es una que tiene un [*zipper*] y la cierran; pues estaba abierta el [*zipper*] y la [B]iblia. Manifestó [é]l no haber cogido la [B]iblia.

Manifestó que el dormitorio estaba revuelto con la s[á]bana, unas en el piso y otras estaban en una orilla de la cama. Hab[í]a unos zapatos frente a la mesa esa y unas manchas de sangre.

A la pregunta de c[ó]mo estaba ese apartamento contestó que habí[a] dos o tres trastes en el fregadero. La sala parecía más donde habita un hombre solo. O sea que no la había ordenado como cuando hay de hecho una mujer en el hogar. Estaba desorganizada.

Preguntado si vio sangre en la cama[,] dice haber visto una mancha de sangre en la s[á]bana, no vio ninguna mancha de sangre ni en la sala ni en la cocina.

Preguntado si Luis le había descrito el hombre que había entrado con su esposa, le dijo que sí, que era un hombre alto, fuerte y de afro. Preguntado si el testigo le preguntó al acusado si él conocía a ese hombre, el acusado le contestó que no lo conocía[,] pero que s[i] lo veía podría reconocerlo. Que no lo había visto antes.

Atestó el testigo que el imputado le había manifestado a una pregunta suya que después que el hombre que tenía el revólver una vez empujó a Elizabeth salió corriendo y se montó en un vehículo gris grande y salió de allí a veloz carrera, que él sali[ó] al balcón y no pudo tomar la tablilla. El testigo manifestó no recordar si le preguntó por el revólver ni que [é]l le haya hecho manifestación alguna. El no ocupó en el apartamento o en ningún otro lugar, el revólver o el cuchillo.[1] E.N.P., págs. 7-9.

---

[1] Cuando el testigo llegó al apartamento, ya se habían llevado la víctima para el hospital.

También declaró que el acusado le había dicho que el miércoles anterior, al regresar de su trabajo, encontró a su esposa besándose con otro individuo, que conoce como Humber, en el sofá de la sala. Le dió un puño a Humber y dos a su esposa. Ellos salieron corriendo del apartamento pero él no los pudo alcanzar. Añadió lo siguiente:

> Le muestran la identificación #8 como los papeles que Luis sacó de la pequeña gaveta y me dijo que eran los apuntes de los problemas que él había tenido con su esposa desde el día 21 de noviembre. El día 22 de noviembre manifestó que él fue a casa de la suegra con sus dos hijos ya que él tenía que trabajar y no podía atender los muchachos. En la casa de la suegra tuvo una discusión con la hermana de su esposa y ella y todos lo insultaron. Fu[e] al Tribunal de Juana Díaz a radicar una querella, como que había llevado los niños allá para que la mamá de ellos se encargara de ellos y ver si un policía iba con él y se podía resolver el problema. Logró dejar los nenes allá y alguien lo orientó para que al otro día fuera a Relaciones de Familia y presentara el problema. Manifestó el testigo que Luis le dijo que él fue el viernes al Tribunal para hablar con el juez pero éste estaba ocupado y s[ó]lo pudo hablar con un marshall, que no sabe su nombre, quien le indicó que fuera a Relaciones de Familia. A preguntas que si le informó el propósito de la visita del viernes al Tribunal de Juana Díaz, manifestó que aquél le informó que había ido para hablar con el juez a ver hasta qu[é] punto el juez lo podía orientar con relación al problema de él con su esposa y qu[é] hacer con los hijos de ellos.
>
> A preguntas de que si el acusado le indicó si Humber y la persona que acompañó a su esposa y portaba un revólver eran la misma persona[,] manifestó que aquél le había dicho que no era la misma persona. E.N.P., págs. 13–14.

El testimonio del otro agente investigador, Luis Felipe Pérez, se circunscribió a relatar que en la búsqueda que hizo en el apartamento y sus alrededores, no localizó ningún

pedazo de china, cáscaras, cuchillos, ni nada de eso.(2) Él estaba presente cuando el fiscal entrevistó al acusado, pero éste no dio ninguna información. E.N.P., págs. 14–16.

Edwin Rodríguez Santiago era novio de Evelyn, la hermana del apelante. El día de los hechos fue al Caserío Pedro M. Descartes. Vio un carro gris y grande, estacionado al frente. Dentro del carro vio a la suegra de Luis que estaba en la parte de atrás y otra persona que no conocía en el asiento del chofer. Luego un vecino de nombre Tito lo llamó. En esos momentos salió el apelante al balcón de su apartamento y preguntó por un hermano de él, llamado Ramón. Edwin le preguntó a Luis qu[é] había pasado y éste le contestó "la maté". El testigo subió con Tito y fueron directamente al cuarto. En la sala no había nadie. Encontraron a Elizabeth acostada en el piso boca arriba herida por debajo de la costilla derecha. Tito y él la bajaron y la montaron en la ambulancia.(3) Elizabeth no habló con él, sólo se quejaba mientras él la acompañó dentro de la ambulancia. Luego declaró que cuando Luis habló con él, ya el carro gris grande no estaba allí. E.N.P., págs. 16–18.

El Dr. Fernando Valle practicó la autopsia de la occisa. El cuerpo "presentaba una herida incisa de 1½″ de longitud, dirección horizontal a la derecha de la base, [el] apéndice xifoide[s], [o sea] en el,... [punto central del tórax]". "Esa herida incisa fue producida por un instrumento de punta y filo y penetraba en la cavidad toráxica." E.N.P., pág. 19.

Continuó declarando que:

La segunda herida era también incisa producida por un instrumento de punta y filo. Tenía dirección igual horizontal, de una longitud de dos pulgadas en la región subc[os]tal

---

(2)Estaba con el fotógrafo de la Policía que tomó las fotografías del sitio de los hechos, pero éstas no salieron por haberse dañado.

(3)No hay prueba de quién llamó a la ambulancia.

derecha, debajo de la costilla que penetraba en la cabida abdominal. Por la herida hac[í]a propulsión, o sea había botado lo que llamamos omento mayor, que es la capa de grasa delante de la tripa. Tenía además unas contusiones pequeñas en la región orbitaria, o sea alrededor del ojo izquierdo, mejilla y cara lateral del brazo izquierdo. La cabida perit[one]al contenía la sangre que provino de la perforación [del] lóbulo izquierdo del hígado y penetró en el tórax.

El pericardio estaba repleto de sangre que provenía de una herida del vent[rí]culo derecho del corazón de su cara interior y de la cara posterior [de la aurícula] derecha del corazón. Ambas heridas de [aurícula] y ventr[í]culo fueron producidas por un instrumento cortante que penetró y perforó. La herida que penetró a la derecha del apéndice xifoide[s] atravesó el ló[b]ulo izquierdo del h[í]gado, subió al tórax y ahí fue donde produjo las dos heridas del corazón. A preguntas del fiscal aclara que una sola herida fu[e] la que perforó el corazón. La otra herida que entró por el abdomen no hizo daño mortal inmediato. La herida mortal era la que perforó el corazón y tenía una profundidad de seis pulgadas. A la pregunta del fiscal que cu[á]l era la posición del arma[,] [c]ontestó que en ambas heridas la hoja est[á] en sentido horizontal. E.N.P., págs. 19–20.

Declaró que la occisa estaba de frente al arma cuando recibió las heridas. Podía estar erguida, acostada, sentada, en cualquier posición que no fuera estar acostada boca abajo. Luego atestó que:

. . .A la pregunta específica de que si [son] compatible[s] las heridas recibidas con el hecho de que el cuerpo ha sido empujado hacia el arma, contest[ó] que nunca, porque el cuerpo tiene que tener dos caídas o una caída con dos cuchillos, pero no puede[n] ser dos heridas. Al pregunt[á]rsele si no es posible que si a una persona la empujan y se va hacia el frente y la persona que recibe el cuerpo tiene un cuchillo en la mano y en el deseo de ayudar a esa persona, ¿no es posible que sacando el arma le haya infl[i]gido la otra herida al cuerpo irse otra vez hacia adelante? Contestó que [é]l no sabe c[ó]mo sucedieron los hechos de este caso, pero que es posible. E.N.P., pág. 21.

## I

■ La anterior prueba resulta ser suficiente para establecer los elementos del delito de asesinato. Se probó que se ha sufrido un daño (la muerte) y que este daño fue ocasionado por un agente criminal. *Pueblo* v. *Hernández*, 75 D.P.R. 907 (1954). Más aún, la identidad del autor (el acusado apelante) quedó comprobada por la totalidad de las circunstancias presentes, entre éstas sus admisiones al policía García Vázquez y a su cuñado, Edwin Rodríguez Santiago.

■ Aparte de que la insólita versión del acusado no le mereció crédito al jurado, resolvemos que la prueba es suficiente para establecer el delito fuera de duda razonable sobre la culpabilidad del acusado. *Pueblo* v. *Miranda Ortiz*, 117 D.P.R. 188 (1986); *Pueblo* v. *Bigio Pastrana*, 116 D.P.R. 748 (1985). Sabido es que no intervendremos con la apreciación de la prueba y la adjudicación de credibilidad del juzgador de los hechos, a menos que haya error manifiesto, pasión, prejuicio o parcialidad. *Pueblo* v. *Miranda Ortiz*, ante; *Pueblo* v. *Borrero Robles*, 113 D.P.R. 387 (1982); *Pueblo* v. *Pagán Díaz*, 111 D.P.R. 608 (1981); *Pueblo* v. *Millán Meléndez*, 110 D.P.R. 171 (1980). En este caso no hay base alguna para alterar los veredictos rendidos. En todo caso el jurado le dió al acusado el beneficio de la duda al rebajar la calificación del delito a uno de asesinato en segundo grado.

## II

■ El apelante se queja de que el tribunal haya impartido la siguiente instrucción:

La huida o la fuga, la supresión de evidencia, el hacer manifestaciones engañosas o falsas es una circunstancia, de ente[n]der ustedes que ha sido probada, para ser apreciada

y ponderada como tendiente en algún grado o modo a establecer un sentimiento de culpabilidad. El Tribunal les enfatiza que dicha prueba por sí sol[a] no es suficiente para establecer la culpabilidad del acusado. Es de la estricta incumbencia de ustedes determinar su alcance, así como el peso que merezca considerando todas las circunstancias que concurren en el caso. T. E., pág. 14.

Al objetarse dicha instrucción por haberse incluido el elemento de la huida, sin que la prueba lo justificara, el tribunal dio la siguiente explicación:

HON. JUEZ ORTIZ JUAN:

En cuanto a esa instrucción se refiere por hacerle el favor al acusado no quise subrayar manifestaciones engañosas o falsas y para no hacerlo incluí las tres cosas que el Jurado debe tomar en consideración. Si digo manifestaciones engañosas o falsas es una circunstancia, etcétera, etcétera, creo que acentuaba ese hecho ante el Jurado con una posible creencia del Juez de que había habido [sic] manifestaciones engañosas o falsas y para evitar eso di la instrucción en su totalidad, la huida, fuga, supresión de evidencia, etcétera, etcétera para diluir el contenido de que no se acentúe para lo que ellos podían entender que era el pensamiento del Juez. Con esa explicación anótese la excepción del compañero. T. E., págs. 42–43.

Esa explicación es satisfactoria. Aunque la instrucción fuera innecesaria y errónea, no resulta perjudicial. No hay base para concluir que el veredicto hubiera sido distinto de no haberse impartido dicha instrucción. No se ha demostrado que la instrucción violara derechos fundamentales o sustanciales del acusado. *Pueblo* v. *Ortiz Martínez*, 116 D.P.R. 139 (1985); *Pueblo* v. *Prados García*, 99 D.P.R. 384 (1970).

## III

El apelante sostiene que se cometió error perjudicial al no impartir instrucciones especiales al jurado sobre

los posibles veredictos de homicidio voluntario e involuntario y sobre los elementos de defensa propia. Alega que la prueba justificaba dichas instrucciones. No le asiste la razón. En *Pueblo* v. *González Colón*, 110 D.P.R. 812, 815–816 (1981), expusimos la regla de derecho aplicable a este planteamiento.

Nuestro ordenamiento tiene como principio rector que las instrucciones al jurado deben cubrir, si la prueba lo justifica, no sólo los elementos de delitos inferiores al delito imputado o comprendido dentro de éste, sino también los elementos esenciales de las defensas levantadas por el acusado, así como los puntos de derecho que bajo cualquier teoría razonable pueden estar presentes en las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo* v. *Prados García,* 99 D.P.R. 384 (1970); *Pueblo* v. *Tufiño Cruz,* 96 D.P.R. 225 (1968); *Pueblo* v. *Burgos,* 76 D.P.R. 199 (1954). *Pueblo* v. *Serbiá,* 75 D.P.R. 394 (1953); *Pueblo* v. *Méndez,* 74 D.P.R. 913 (1953); *Pueblo* v. *Galarza,* 71 D.P.R. 557 (1950). Ello es así porque corresponde al jurado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél aquilate la prueba y determine los hechos. La norma a este respecto fue claramente expuesta en *Pueblo* v. *Galarza,* supra:

"No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el jurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio voluntario, es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fué homicidio voluntario y no asesinato.

. . . . . . . .

"Para la corte la prueba puede tender a demostrar de manera abrumadora que se trata en verdad de un asesinato, y no de un homicidio o de un acto de defensa propia. Empero, mientras haya alguna prueba pertinente a la cuestión de homicidio, la credibilidad y peso de la misma es cuestión a ser determinada por el jurado, y no una de

derecho a ser resuelta por el tribunal. *Pueblo* v. *Galarza,* a las págs. 561–562."

En el caso de autos la defensa solicitó las instrucciones objeto de este señalamiento. Al concluir las instrucciones hubo el siguiente intercambio entre el abogado del acusado y el tribunal.

LIC. RODRÍGUEZ:

También, Vuestro Honor, en el día de ayer se radicó en este Tribunal una moción solicitando instrucciones especiales donde solicitamos la instrucción específica de Homicidio Voluntario, Homicidio, diferencia entre Homicidio y Homicidio Involuntario, absolución por defensa propia, diferencia entre Asesinato y Homicidio y prueba de corroboración. En cuanto a la prueba de corroboración nos satisface la que ha dado el Magistrado en relación a una prueba en cuanto a la relación del cuerpo del delito mientras estaba dando esas instrucciones. En cuanto a las demás, Vuest[r]o Honor, por los fundamentos expresados en dicha moción y lo que argumentamos ayer, lo dejamos sometido a su consideración.

HON. JUEZ ORTIZ JUAN:

Bien, el Tribunal no dio instrucciones de Homicidio Involuntario por ser improcedentes las mismas y contrarias a la prueba exculpatoria que se presentó en el Tribunal por el señor Fiscal a través del agente. Aquí la única prueba que tuvo el Tribunal en cuanto a Homicidio, obviamente, no hay prueba ninguna de arrebato de cólera, súbita pendencia, nada, y en base a eso se denegaron por ser inaplicables.

Como consecuencia, la diferencia entre Homicidio y Homicidio Involuntario no había que darla. La absolución por defensa propia, aquí no se estableció agresión, por propio abogado así lo argumentó, el acusado nunca agredió ni inició agresión alguna para defenderse al levantarse de la cama. Según versión del acusado, fue empujada la mujer de él, la esposa de él y se espetó, según las palabras que él usó, se espetó el cuchillo. No es que él la apuñaló, es que ella se espetó el cuchillo que tenía en la mano. Por lo tanto, no hay una defensa propia. Diferencia entre Asesinato y Homicidio

Voluntario no había razón para darla si no se daban las instrucciones de Homicidio. La prueba de corroboración se le concedió. Estas son las razones por la cual el Tribunal, después de estudio largo y detallado de la prueba y la Ley que el compañero quería, tuvo para negar dichas instrucciones.

LIC. RODRÍGUEZ:

Vuest[r]o Honor, simplemente lo que nosostros queremos expresar es que el Honorable Magistrado[,] eh, aprecia la prueba de una manera distinta como la hemos apreciado y como ha desfilado por el Tribunal. Nosotros entendemos, muy respetuosamente, como dice del Magistrado, que se levanta de la cama y empuña un arma que está accesible a él, un cuchillo, empuña un cuchillo que está accesible a él, producto de la, del señor que lo está apuntando y en defensa de su vida es que se levanta con el cuchillo. Esto es lo que provoca esta situación. Eso es lo que provoca la defensa. Nuestro Tribunal ha dicho y ha expresado lo que nosotros, en el caso de Pueblo versus Colón González, que a[u]n bajo, es una situación de hechos que debe ir al Jurado. Que es el Jurado el que debe dilucidar esa situación. Esa es nuestra contención, Vuestro Honor.

HON. JUEZ ORTIZ JUAN:

Yo he escuchado su contención. La escribió el compañero, me la reproduce oralmente en sala de nuevo, ayer lo hizo en sala también. Yo no he evaluado la prueba en cuanto a culpa o no culpa. Esa no es mi función. La he evaluado en cuanto al proceder o no de ciertas instrucciones. El mero hecho de que un hombre est[é] aprehensivo, con razón para ello, de que lo pueden atacar, de que lo pueden matar, si es que es verdad eso, yo no voy a entrar en eso, si eso es verdad o no es verdad y tiene un arma en la mano, la coge para defenderse, no hace nada, le falta un elemento, el haber hecho alguna gestión, sea la que fuere.

La mera disposición y pensamiento de que me voy a defender, como lo expresó en una de las manifestaciones, sin hacer nada, y ahí mismo le tiran la persona encima y queda espetada, que es la palabra que [é]l usa, yo entiendo que no. T. E., págs. 45–46.

■ Como correctamente resolvió el juez de instancia, aquí la prueba no justificaba que se instruyera sobre los delitos menores. La prueba exculpatoria, según surge de la prueba de cargo, no contiene ninguno de los elementos esenciales del delito de homicidio voluntario; Art. 85 del Código Penal de 1974 (33 L.P.R.A. sec. 4404). Por el contrario la versión del apelante excluyó la existencia de una súbita pendencia o arrebato de cólera, elementos esenciales de dicho delito. *Pueblo* v. *Colón Soto*, 109 D.P.R. 545, 548 (1980);(4) *Pueblo* v. *Sulman*, 103 D.P.R. 429 (1975). Por ello no se justifica la instrucción solicitada. *Pueblo* v. *Prados García*, ante. En *Pueblo* v. *Serbiá*, 75 D.P.R. 394, 398 (1953), reiteramos que:

> Indudablemente, en un caso de asesinato, el tribunal sentenciador debe darle al jurado instrucciones de homicidio si de los autos surge alguna evidencia que justifique un veredicto de homicidio. Aun cuando esa evidencia sea escasa o débil, la misma debe apreciarse por el jurado y no por la corte. *Por otro lado, el tribunal sentenciador no debe transmitir instrucciones de homicidio si los autos están húerfanos de toda evidencia que justifique tal veredicto.* Permitir que subsista tal práctica equivaldría en efecto a permitir al jurado a imponer un castigo diferente a aquél prescrito para el delito que de hecho se cometió. (Énfasis suplido y citas omitidas.)

■ Idéntico razonamiento nos convence que tampoco erró el tribunal al negarse a impartir instrucciones sobre homicidio involuntario. Este delito, según tipificado en el Art. 86 del Código Penal de 1974 (33 L.P.R.A. sec. 4005), requiere que el autor obre con negligencia o que al realizar un acto ilegal que no constituyere delito grave, ocasionase la

---

(4) En *Pueblo* v. *Colón Soto*, 109 D.P.R. 545, 548 (1980), en cuyo caso se examina el tratamiento estatutario del asesinato y el homicidio en Puerto Rico y se concluye que los hechos no cuadran con los requisitos que establece la ley para el delito de homicidio.

muerte de otra persona. En el caso de autos, la prueba no presenta ninguno de dichos elementos del delito. En cuanto al acto negligente, el mismo es inexistente. De habérsele dado crédito a la versión del acusado, lo único que hizo fue coger un cuchillo. Si el supuesto tercero tiró la esposa del acusado encima de éste, este acto no le es atribuible. La muerte, de haber ocurrido según lo alegado, fue causada por el acto criminal o negligente del tercero, no del apelante. Claro está, el hecho de haber cogido un cuchillo en sus manos, dentro de su propia vivienda, no constituye un acto ilegal. Tenemos pues, que los hechos del caso no daban lugar a una instrucción sobre homicidio involuntario. Lo único que procedía en este caso era la instrucción sobre caso fortuito que efectivamente impartió el juez de instancia. A esos efectos le instruyó al jurado que:

> . . . Siendo ello así, habiendo esa versión, el Tribunal les va a transmitir una instrucción específica sobre el particular. Tomando en consideración todas las demás instrucciones que les he dado, la de las versiones que dan las partes, los testigos, la instrucción específica que les di sobre las manifestaciones del acusado hechas fuera del Tribunal, hay una defensa en Derecho que se conoce como caso fortuito y la ley es la siguiente: La teoría no es del acusado dicha en corte, es la teoría del acusado a través del policía que declaró en el caso, que es prueba del Fiscal; consiste en que al realizar los hechos que se le imputan como constitutivos de delito él causó daño por mero accidente, desgracia o casualidad, sin mediar intención ni negligencia criminal.
>
> La Ley dispone que no incurre en responsabilidad la persona que, en ocasión de ejecutar un acto lícito con la debida diligencia, o al incurrir en una omisión, causa daño por mero accidente, desgracia o casualidad, sin mediar intención ni negligencia.
>
> Para que prospere esta defensa la Ley requiere lo siguiente: Que el daño causado sea el resultado de un accidente, desgracia o casualidad, sin mediar intención ni negligencia criminal. Que el daño causado surgió al ejecutarse un acto

lícito, con la debida diligencia o sea, mientras se actuaba conforme a la Ley. Si el acto inicial es delictivo o si no se actuó con la debida diligencia[,] la defensa no puede prosperar. T. E., págs. 28–29.

Esta instrucción se ajusta al derecho aplicable. Véase el Art. 18 del Código Penal de 1974 (33 L.P.R.A. sec. 3091), que dispone:

*3091. Caso fortuito*

No incurre en responsabilidad la persona que, en ocasión de ejecutar un acto lícito, con la debida diligencia, o al incurrir en una omisión, causa daño por mero accidente, desgracia o casualidad, sin mediar intención ni negligencia.

Al comentar dicho principio, la profesora Dora Nevares-Muñiz nos dice que:

El artículo 18 del Código Penal incluye el caso fortuito como causa de exclusión de responsabilidad penal. Se trata de los casos en que el daño ocurre por razón de un accidente, desgracia o casualidad no provocado por el actor. En efecto, el texto del artículo 18 es una copia casi literal del artículo 8 del Código Penal Español. Comentando este artículo, QUINTANO RIPOLLES, *Comentarios*, 124 dice que, "la voluntad del agente no desempeña papel trascendental alguno, y el mal determinado por su acto no es más que un producto del azar".

. . . . . . . .

El segundo requisito consiste en que el acto o la omisión lícita, se ejecute con la debida diligencia. Es decir, no puede incurrirse en imprudencia, temeridad, descuido o tipo alguno de negligencia, en la ejecución de la acción u omisión de cuyo efecto la persona intenta eximirse de responsabilidad por ser un caso fortuito. A estos efectos nuestro Tribunal Supremo en *Pueblo* v. *Avilés Rodríguez*, 95 D.P.R. 318 (1967)[,] ha dicho que la prudencia y circunspección requeridas en esta defensa no son sinónimos de predicción e infalibilidad.

Esta faceta del caso fortuito es fundamental puesto que deslinda el área que exime de responsabilidad penal de forma

absoluta y la que conserva esta responsabilidad a título de imprudencia y falta de circunspección en el comportamiento.

. . . . . . . . .

En resumen, el daño causado debe haber ocurrido por mero accidente, desgracia o casualidad, sin mediar intención o negligencia por parte del que invoca la defensa. Nótese que, aunque existe un resultado dañoso, no hay responsabilidad penal[,] ya que el mismo no se realizó con la culpabilidad o estado mental requerido en la tipificación del delito. En la medida que el acto original fue lícito, no hay negligencia ni intención criminal, de lo que se trata es de un mero accidente. Véase por ejemplo *Pueblo* v. *Pérez*, 79 D.P.R. 487, 494 (1956) (caso de un accidente automovilístico inevitable). D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, Sec. 6.3, págs. 174–177.

La instrucción sobre caso fortuito procedía excluyendo las instrucciones de homicidio en sus dos facetas, voluntario o involuntario.

## IV

Resta por considerar si bajo los hechos del caso procedía una instrucción sobre legítima defensa, como causa de exclusión de responsabilidad. Esta defensa está expresamente reconocida en el Art. 22 del Código Penal de 1974 (33 L.P.R.A. sec. 3095) en la siguiente forma:

*3095. Legítima defensa*

No incurre en responsabilidad el que defiende su persona, sus bienes o derechos, o su morada, o la persona, bienes o derechos, o morada de otros en circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente, siempre que hubiere necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación suficiente del que ejerce la defensa, y no se inflija más daño que el necesario al objeto.

Para justificar el dar muerte a un ser humano, cuando se alegue legítima defensa, es necesario tener motivos fundados

para creer que al dar muerte al agresor se hallaba el agredido o la persona defendida en inminente o inmediato peligro de muerte o de grave daño corporal.

Veamos cuáles son los requisitos para invocar esta defensa (también conocida como defensa propia). Nevares-Muñiz, *op. cit.*, pág. 193, los resume así:

La legítima defensa como causa de justificación o eximente de responsabilidad penal puede ser invocada para defender a la persona, sus derechos o bienes, incluyendo la morada. También se puede invocar en defensa de la persona, bienes, derechos o morada de un tercero. El primero de los requisitos de esta defensa es que la persona tenga una creencia razonable de que se ha de sufrir un daño inminente. El segundo requisito es que haya necesidad racional del medio utilizado para impedir o repeler el daño. En estos casos, cuando se habla de necesidad racional y de creencia razonable no es la de cualquier persona, sino la del hombre/mujer prudente y razonable. El tercer requisito es que no. haya provocación de parte del que invoca la defensa. Cuarto, tampoco puede éste infligir más daño que el necesario para repeler o evitar la agresión o el daño inminente.

■ Es evidente que en este caso la prueba no justificaba una instrucción sobre legítima defensa. Aunque podía estar presente la creencia razonable de que se iba a sufrir un daño inminente, lo cual justificaba armarse con el cuchillo, la forma en que ocurrieron los hechos, según una de las versiones del acusado,(5) no justificaban la instrucción. Aquí no hubo necesidad de impedir o repeler el daño. *Pueblo* v. *De Jesús Santana*, 100 D.P.R. 791 (1972).

---

(5) Nótese que a su cuñado y amigo Edwin el acusado sólo le informó que había matado a su esposa. No mencionó ninguno de los hechos relatados al agente investigador, que, por cierto, llegó al lugar después de Edwin haberse ido con la víctima. Esto denota que el apelante tuvo tiempo para elaborar la versión que posteriormente le dio al agente.

La admisión del acusado de que la mató porque el tercero desconocido le tiró a su esposa encima, lo único que demuestra es que la muerte fue accidental. Bajo esa prueba no era necesario que el jurado determinara si el acusado infligió a la víctima más daño que el necesario para repeler o evitar un daño inminente. Dicho de otra forma, el acusado no mató a su esposa mientras se defendía, en una forma prudente y razonable, de una agresión. Este no es un caso en que el hecho del acusado presentar prueba que contiene los elementos esenciales de la defensa, aunque ésta sea débil, inconsistente o de dudosa credibilidad, obliga al tribunal a impartir instrucciones pertinentes. *Pueblo* v. *González Colón*, ante. Sencillamente en este caso la prueba no estableció un caso prima facie de legítima defensa, según ésta ha sido reconocida por el legislador, Art. 22 del Código Penal de 1974 (33 L.P.R.A. sec. 3095), y *Pueblo* v. *León*, 53 D.P.R. 429 (1938).

## V

Por no haberse cometido los errores señalados y por tener la certeza moral de que los veredictos están ampliamente sostenidos por la prueba, concluimos que en este caso se hizo justicia.

*Se confirmarán las sentencias apeladas.*

El Juez Asociado Señor Negrón García concurre en el resultado sin opinión escrita. El Juez Asociado Señor Rebollo López disiente sin opinión escrita.